Patricia E. GENTALA and Robert A. Gentala, Plaintiffs–Appellants–Cross–Appellees,

v.

The CITY OF TUCSON, Defendant–Appellee–Cross–Appellant.

Nos. 97–17062, 97–17069.

United States Court of Appeals, Ninth Circuit.

March 30, 2001.

Argued and Submitted En Banc Sept. 19, 2000

Filed March 30, 2001

Kevin H. Theriot, Lawrenceville, Georgia, for the plaintiffs-appellants-cross-appellees.

Merle Turchik, Deputy City Attorney, Tucson, Arizona, for the defendant-appellee-cross-appellant.

Before: SCHROEDER, Chief Judge, FERNANDEZ, T.G. NELSON, KLEINFELD, SILVERMAN, GRABER, MCKEOWN, WARDLAW, W. FLETCHER, RONAL M. GOULD, and BERZON, Circuit Judges.

Opinion by Judge BERZON; Dissent by Judge FERNANDEZ; Dissent by Judge KLEINFELD.

BERZON, Circuit Judge:

The pivotal question in this case is whether a city may, using tax funds and public employees, provide stage lighting, sound, and other special-event services for a sectarian religious organization's prayer service held in the bandshell of a public park. The City of Tucson believed that to do so would violate the Establishment Clause of the First Amendment. For that reason, although Tucson, through its Civic Events Fund ("Fund"), does provide such

support to certain events held in public parks, Tucson declined the National Day of Prayer Committee's request that it provide the equipment and services for its National Day of Prayer gathering. We agree with Tucson that although the Establishment Clause remains a "blurred, indistinct and variable barrier" to government support for religious activity, *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105 (1971), "the circumstances of [the] particular relationship," *id.*, between Tucson and recipients of Civic Events Fund support is such that Tucson was correct in concluding that the requested funding would have fallen on the Establishment Clause side of that "serpentine" wall. *McCollum v. Board of Educ.*, 333 U.S. 203, 238, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (Jackson, J., concurring). Tucson's decision to refuse Civic Events Fund support to the prayer service's organizers therefore did not run afoul of another First Amendment proscription, against abridging freedom of speech.

## Background

### I. The Tucson National Day of Prayer Gathering

The Tucson National Day of Prayer Committee ("Prayer Committee") is an organization that, according to its funding application to the City, requires its members to "pledge [a] specific religious belief," namely, Christian, and terminates the membership of any member who does not do so.[1] In the spring of 1997, the Prayer Committee organized a National Day of Prayer gathering described in that application as "an annual gathering of Tucson Christians." As planned and as carried out, the event, open to the public, involved "a time of prayer and worship" led by "[p]astors from nine different churches," and two choirs. More than 500 area church congregations were invited to participate in prayers "for local, state and national issues." Contributions were collected from attendees for the purpose of paying for this event and future similar events.

The Prayer Committee chose to hold its National Day of Prayer service in and around a bandshell in Tucson's Reid Park. The organizers applied for and received a permit from the City to use the bandshell, and the event went forward as planned. Tucson in no way prevented the Prayer Committee from holding its prayer service in Reid Park nor interfered with its doing so, instead allowing the Prayer Committee's organizers and members to use the park, as other citizens may do, "for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).[2]

The Prayer Day's organizers, including the appellants here, Patricia and Robert

1. It is worth noting at the outset that this case does not concern the constitutionality of the Congressionally-established National Day of Prayer. Congress first proclaimed such an annual "day" in 1952, as it has issued innumerable other resolutions proclaiming national "days." *See generally* 36 U.S.C. §§ 101–143. It does not appear that there is any federal government funding or support for any National Day of Prayer events; the National Day of Prayer Task Force that promotes participation in the event is a private, nonprofit organization. Nor is the National Day of Prayer in any respect sectarian (although its very point is to favor religion over nonreligion). The original congressional resolution, Pub.L. No. 82–324 (1952), the 1988 amendment fixing the first Thursday in May as the National Day of Prayer, Pub.L. No. 100–307 (1988), *codified at* 36 U.S.C. § 119, and the Task Force all stress that the Day is meant as an opportunity for all Americans who wish to do so to pray according to their own faith, not to promote any particular religion or form of religious observance.

2. From the earliest days of the public forum doctrine, it has been understood that traditional public forums like the public parks, streets, and sidewalks are open not only to secular expression but to religious expression as well. *See, e.g., Schneider v. State*, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Jamison v. Texas*, 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); *Martin v. City of Struthers*, 319 U.S. 141, 150, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (Murphy, J., concurring).

Gentala, were not seeking, however, simply to use the park for their event. They also wanted the City to cover the costs of city-supplied lighting and audio systems. The Prayer Committee applied for free use of $340 worth of such equipment and related services for which the City ordinarily charges a fee, observing that "without help, we will have [an] inadequate stage and sound package, as previous years did."

## II. The Tucson Civic Events Fund

The City does fund such equipment and services for some private events held in the City's parks, through a fund denominated the "Civic Events Fund." Tucson, however, refused the Prayer Committee's request for support, on the basis of an established policy precluding funding of events directly supporting religious organizations. The reason for the policy, as Tucson notified Patricia Gentala in denying her funding request and has consistently maintained in this litigation, is to avoid Establishment Clause violations.[3]

Modern Establishment Clause doctrine is a species of constitutional inquiry which, as we shall develop as we go on, abjures absolutist doctrines and emphasizes contextual analysis instead, and in which the devil is, consequently, emphatically in the details. We therefore focus here on the features of Tucson's Civic Events Fund program with, perhaps, unusual specificity.

Tucson charges small fees ($75) for use of bandshells in city parks, but that general fee is not at issue in this case. Additionally, Tucson will provide, for specified fees, certain equipment and services for use at public facilities by any "civic, social, religious, charitable, commercial or other users." The Prayer Committee is therefore eligible to use the available equipment as long as it pays the applicable fee.

The available rental equipment includes, for example, display booths, portable stages, bleachers, portable public address systems, microphones, speakers, extension cords, automated refuse containers, lighting systems and serving tables. For audio and lighting equipment used at the bandshell in Reid Park, the City requires that its staff operate the equipment. The rental fees charged for the use of that equipment therefore include labor charges, and City employees operate the equipment during the event. Ordinarily, an event's organizers pay the necessary fees to the pertinent city department, which, for lighting and audio equipment, is the Parks and Recreation Department.

The City has determined that, aside from allowing the public to use the parks, facilities such as bandshells, and city-owned equipment, the City will "support and encourage" certain "Civic Events." The kinds of events that the City wishes affirmatively to support include those that: "celebrate and commemorate the historical, cultural and ethnic heritage of the City and the nation, or increase the community's knowledge and understanding of critical issues ... [;] generate broad community appeal and participation[;] instill civic pride in the City, state, or nation[;] contribute to tourism[;] or are identified as unique community events."

The City will recognize as a Civic Event only events sponsored by non-profit organizations or "individuals conducting the events on a non-profit basis," that is, "with fund-raising proceeds used for a community benefit." This limitation means that, whether or not they meet the substantive criteria for Civic Event designation, the City does not "support and encourage" corporate picnics, commercial concerts, or private birthday or anniversary celebrations in city parks (although the City does, as we understand the record, permit organizers of such·events to use city-owned equipment and personnel if they pay the required fees).[4] Also excluded from Civic

---

3. For reasons that appear later, the Establishment Clause issue turns out to be dispositive, so we concentrate here upon the facts pertinent to that issue.

4. The record does not contain any information concerning the total number of park event permits approved for any relevant year or the total number of park events whose

Event designation and support are events sponsored by organizations that already receive city funding, whether directly or through rent waivers for use of city property. Finally, and critically here, among the events that "may [not] be considered for City·support through the Civic Event process" are "events held in direct support of religious organizations."

As part of its support and encouragement of Civic Events, Tucson maintains a Civic Events Fund, consisting of moneys appropriated from its general coffers and derived from tax revenue, among other sources. Organizers of eligible events may apply for payment from the Fund of any fees incurred for use of city equipment or services. When such financial support is approved, however, the City (with limited exceptions) does not provide any money directly to the event's sponsors. The city department that would ordinarily bill the event's sponsors instead bills and receives payment from the Fund. Of course, both the Fund account and the departmental account are city accounts. To implement its subsidy program, therefore, the City simply transfers on its books the amount of any fees from the Fund to the appropriate department, as "a budgetary means of detailing the costs City departments incur providing in-kind support to Civic Events."

Organizations receiving Fund support are required to: maintain financial records concerning the event and, on request, "provide City staff prompt access to such financial records and any additional financial information about the sponsoring organization"; obtain liability insurance for the event;[5] and coordinate the planning of the event with a city Civic Event Coordinator. Additionally, to receive Civic Event Fund support, event organizers must promise to publicize the City's contribution of services in their event advertising and in an announcement made during the event.

In the 1996–97 and 1997–98 fiscal years, the City appropriated $170,760 from its General Fund to the Civic Events Fund. A subcommittee of the City Council made decisions on applications for support of less of than $1,500; the Mayor and the full Council ruled on larger requests.

The Fund application and a document entitled "Civic Event Fund Policy Statement and Evaluation Criteria" spell out the criteria for funding in great detail. Among those criteria, in addition to the substantive ones summarized above, are: the need for support, including whether the sponsoring organization can pay some or all of the fees itself and whether it has explored other sources of support; whether the funding request is a first-time request or not ("The Mayor and Council believe[ ] that events should eventually become self-reliant.... To encourage events to become self-reliant, City support provided in subsequent years may be gradually reduced."); and whether the event "generates broad community appeal and participation," although "special consideration will ... be given to small first-time events conducted by organizations with limited resources."

Although, as the detailed criteria summarized above indicate, these funding decisions are discretionary, in the only year for which there is complete information in the record there were sufficient funds available that most non-profit groups sponsoring eligible events received funding if they asked for it. In that single fiscal year, 1995, 23 events out of 26 that met the threshold criteria were funded; the Hu-

---

organizers paid fees to use city-supplied equipment or personnel. It is therefore not possible on this record to determine the percentage of all the group events held in the parks that the City supported through the Fund.

**5.** The City's risk manager explained that the amount of insurance required is preset for each kind of public facility; that, if the sponsor cannot obtain the required amount, the risk manager can decrease the required coverage one step, but does so no more than twice a year; that the risk classifications do not take into account the nature of the event or the identity of the sponsors; and that, to his knowledge, no event was ever cancelled for lack of insurance.

mane Society-sponsored Fun Day in the Park, the Sister Cities Fund Raiser, and the Casa Car Show were not funded, for reasons that do not appear in the record.

The City has in the past implemented the exclusion for events directly supporting religious organizations by refusing to pay fees incurred by fundraisers for area religious schools and churches, although the events themselves were not uniformly religious in character.[6] At the same time, the Fund supported other events sponsored by religiously-affiliated organizations when the events did not directly benefit the groups themselves,[7] and events with religious themes sponsored by secular organizations. For example, in 1993, the Fund supported a Las Posadas pageant depicting theatrically events surrounding the birth of Jesus. The Las Posadas event was sponsored not by a religious group, however, but by the Tucson Festival Society and a local public school.

### III. The Litigation

Two weeks before the Prayer Day event, Patricia Gentala, chair of the Prayer Committee, applied for $340 in support from the Fund for lighting and sound equipment and services. On the required application form, she identified the event as coming within the "Historical" category, enclosed a detailed description of the event, summarized above, and noted that there would be a "[f]ree will offer[ ]ing taken at close of program," with any extra money from that collection to be applied to the following year's event.

6. In fiscal years 1991–92 and 1992–93, the Fund declined to support several fundraisers for Christian schools, including the San Xavier Mission School's pageant celebrating "the heritage of the Old Pueblo," the Santa Cruz Church and school's "Fiesta de Familia," the St. John the Evangelist School's annual Fiesta, and the St. Peter & Paul School's "Fun Days." There is no information in the record concerning the City's implementation of the religious-organization exclusion in other years.

7. For example, the City provided Fund support to a fishing clinic for disabled children

The Civic Events subcommittee denied Gentala's application because the event was "in direct support of a religious organization." Gentala sought City Council review of the subcommittee's denial of the Prayer Committee's application for support, and asked the City to reconsider its policy of categorically excluding "events in direct support of religious organizations" from consideration for Fund reimbursement. The City Council concluded that the denial was proper, explaining that it would violate the separation of church and state for the City to sponsor any event directly supporting a religious group.

A few weeks later, Patricia Gentala and her husband Robert Gentala, who also was actively involved in the Prayer Committee, filed this lawsuit, claiming that the exclusion of "events in direct support of religious organizations" from the Civic Events Fund violated the Free Speech, Free Exercise, and Establishment Clauses of the First Amendment,[8] and seeking preliminary and permanent injunctions against excluding the National Day of Prayer and other religious groups from Civic Events Fund support. The Gentalas styled their complaint as both a facial challenge to the policy and a challenge to the policy as applied to them.

On September 30, 1997, the district court denied the Gentalas' motions for an injunction. The district court recognized that the First Amendment's speech protection "extends to religious speech and expression, including prayer and worship," and that, where the government estab-

sponsored by the Aid Association for Lutherans.

8. The Gentalas also alleged that the Civic Events Fund's exclusion of events in direct support of religious organizations violated the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–1–4. By the time the district court ruled in this case, however, that statute had been held unconstitutional, so the district court did not consider this part of the Gentalas' complaint. *See City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

lishes, by tradition or design, a public forum for communicative activity, exclusion of religious speech and expression can be justified only if necessitated by Establishment Clause considerations. The district court noted that the case on which the Gentalas most heavily rely is *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), in which the Supreme Court held unconstitutional the exclusion of a religiously-oriented publication from a university program for funding the printing costs of student publications from mandatory student fees. *Rosenberger*, the district court recognized, is similar to this case in some respects but dissimilar in others. In particular, the district court stressed, *Rosenberger* involved neither the expenditure of tax-derived funds nor funding for a religious organization, while in this case "Plaintiffs represent religious groups seeking tax dollars to support a religious event." As a result, the district court concluded, *Rosenberger* is not determinative here, and "the dispositive inquiry in this case must be made under the Establishment Clause."

Conducting that inquiry, the district court began by observing that, in cases raising issues at the intersection of the Free Speech and Establishment Clauses, " 'specific features of a particular government action,' " not any " 'Grand Unified Theory that may turn out to be neither grand nor unified,' " (quoting *Rosenberger*, 515 U.S. at 853, 115 S.Ct. 2510 (O'Connor, J., concurring)), are central in deciding whether the government is, on the one hand, required to support religiously-oriented speech activities or, on the other hand, precluded from doing so by the Establishment Clause. Noting that *Rosenberger* had stressed that "if the State pays a church's bills it is subsidizing it, and we must guard against this abuse," 515 U.S. at 844, the district court held that compelling Establishment Clause considerations justified the City's denial of the Prayer Committee's funding request because: (1) the Prayer Committee was seeking access to general tax funds; (2) the Prayer Committee is a sectarian religious organization; and (3) if the event were "paid for, equipped by, and operated by the City," there would be a distinct likelihood of creating "the impression that the City was engaged in a costly joint-enterprise with a religious group for religious purposes."

· The district court also rejected the Gentalas' contention that the degree of discretion available to the risk manager with regard to the implementation of the insurance requirement constituted an impermissible prior restraint of the Gentalas' speech.

The Gentalas appealed. We affirm, for reasons in most respects similar to those relied upon by the district court.

### Standard of Review

■■ Observing that the critical facts were undisputed, the district court found that the Gentalas had suffered no harm, denied their motions for preliminary and permanent injunctive relief, and, granting their motion to consolidate the preliminary injunction hearing with the trial on the merits, dismissed their suit. Ordinarily, when a district court consolidates a hearing on a motion for preliminary injunction with a trial on the merits, its findings of fact are reviewed for clear error and its legal conclusions de novo. *Pinette v. Capitol Square Review & Advisory Bd.*, 30 F.3d 675, 677 (6th Cir.1994), *aff'd*, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). Because the facts here are undisputed, we review the district court's decision de novo. Moreover, "[w]hen the district court upholds a restriction on speech as constitutional, we conduct a de novo review of the facts." *Tucker v. California Dep't of Educ.*, 97 F.3d 1204, 1209 n. 2 (9th Cir.1996); *see also Daily Herald Co. v. Munro*, 838 F.2d 380, 383 (9th Cir.1988) (explaining that the rule that "[w]e review de novo the district court's application of law to facts on free speech issues ... reflects a special solicitude for claims that the protections afforded by the First

Amendment have been abridged") (internal citations omitted).

## Discussion

### I. The Free Speech Issues

 The Gentalas' basic submission in this case is that the City's categorical exclusion of events "in direct support of religious organizations" from Fund support impermissibly infringes on the free speech rights of religious organizations such as the Prayer Committee, based on their religious point of view.[9] The parties have therefore, quite understandably, argued vigorously about the free speech aspects, drawing upon different strains of First Amendment doctrine concerning the role of government in supporting communicative activity.

The Gentalas, for example, maintain that the Civic Events Fund is, under the tripartite forum analysis we use to determine the government's obligations when it permits or encourages the use of its property for communicative activity by private speakers, either a limited public forum or a nonpublic forum.[10] In either case, the Gentalas seek to convince us, discriminat-ing against groups in the distribution of Fund support on the basis that their speech expresses a religious viewpoint is unconstitutional. In support of this contention, the Gentalas cite, *inter alia, Rosenberger, Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), and *Lamb's Chapel v. Center Moriches Sch. Dist.,* 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), cases which hold that the government, in administering a limited public forum, may not exclude some or all types of religious expression.[11]

Tucson, not surprisingly, is of the view that the cases the Gentalas rely upon are not pertinent at all to the speech issues in this case. Rather, Tucson argues, the situation here fits into an entirely different mode of First Amendment speech analysis, applicable when the government is in some measure engaged in communicative activity, as it was in *National Endowment for the Arts v. Finley,* 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (government as patron), *Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (government as editor), and *Rust v. Sullivan,* 500 U.S.

9. Although the Gentalas challenged the City's policy both on its face and as applied to them, under the circumstances of this case the two inquiries are effectively one. In considering a facial challenge to the policy, we study the words themselves and the City's "authoritative constructions" of them, through "its own implementation and interpretation" of the policy. *Forsyth County v. The Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). Based on the record before us, the City's application of the blanket exclusion on funding "events in direct support of religious organizations" to the Prayer Committee is fully consistent with and illustrative of its implementation of the policy in other instances in the record.

As for the Gentalas' claim that the exclusion is overbroad, they have not demonstrated that the exclusion chills the protected expression of any parties not before the court, *City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 797, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), and there is no reason to think that it does. The record suggests, instead, that the exclusion effects little, if any, chilling of protected speech. The Prayer Committee, for example,

held a successful prayer service in a city park undeterred by the fact that it did not have the use of the City's sound and light equipment. Nor have the Gentalas shown any material difference between the Civic Events policy as applied to them and as applied to any other speaker affected by the categorical exclusion of events in direct support of religious organizations. Thus, this case is not a candidate for First Amendment overbreadth analysis. *Id.* at 801–02, 104 S.Ct. 2118.

10. *See, e.g., Perry Educ. Ass'n v. Perry Local Educators Ass'n,* 460 U.S. 37, 46–57, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 801, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *DiLoreto v. Downey Unified Sch. Dist.,* 196 F.3d 958, 966–67 (9th Cir.1999).

11. The precise reach of the free speech analysis of these cases is currently pending before the Supreme Court in *Good News Club v. Milford Central School,* 202 F.3d 502 (2d Cir.), *cert. granted,* —— U.S. ——, 121 S.Ct. 296, 148 L.Ed.2d 238 (2000).

173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (government as policy proponent). In all of those cases, some degree of viewpoint or qualitative selection criteria were permitted because the government was engaged not simply in providing a forum for private speech but in forwarding its own program through the speech of others. *See, e.g., Forbes,* 523 U.S. at 673–74, 118 S.Ct. 1633 (noting that the government sometimes assumes roles, such as public broadcaster or curriculum developer, in which its exercise of "editorial discretion" in choosing among prospective speakers is a speech activity on behalf of the government itself, not subject to forum analysis); *Downs v. Los Angeles Unified Sch. Dist.,* 228 F.3d 1003, 1016–17 (9th Cir.2000) (holding that a school district could control the content of messages posted on high school bulletin boards "without the constraint of viewpoint neutrality").

Each of these opposing characterizations of the City's role in developing and expending its Civic Events Fund has some considerations in its favor. On the one hand, the City in this case, like the university in *Rosenberger,* is administering a fund providing in-kind services for a wide range of speakers. A large majority of speakers who meet the applicable Civic Events criteria were in fact funded during the period for which there is evidence in the record, so the very strong element of qualitative governmental selectivity involved in cases such as *Finley* (concerning the administration of the National Endowment for the Arts) or *Forbes* (concerning the editorial discretion necessary in making journalistic decisions) is not present here.

On the other hand, the criteria for funding here are more selective than in *Rosenberger,* albeit not as selective and discretionary as in *Finley* and *Forbes.* That most projects are funded may evidence only self-selectivity by event organizers

aware of the applicable criteria or, more probably, the availability of sufficient funds for the period in question, a circumstance that may not always prevail. Additionally, the City's policy goals here are not, one might conclude, similar to those of the university in *Rosenberger;* while the university was concerned with assuring a vigorous interchange of ideas among students as part of the educational process, the City is concerned with providing for its citizens and tourists events of certain kinds that the City believes enhance Tucson's ambiance as an attractive place to live and visit. Because that is the goal, the City affirmatively identifies itself as the sponsor of funded events, placing its imprimatur on the events in a manner somewhat like the editor of an anthology does, while the university in *Rosenberger* did quite the opposite. *See* 515 U.S. at 841, 115 S.Ct. 2510.

■ Were we required to select among the mutually exclusive Free Speech Clause paradigms the parties propound-each leading under currently prevailing First Amendment doctrine to a different result concerning the City's authority to exclude speakers from a government-provided subsidy because they are engaged in a prayer service-the choice would be a difficult one. It is a choice we need not make, however, in order to resolve this case. For, even assuming that the Gentalas have the better of the battle of the paradigms, that conclusion would not end the inquiry. Rather, as the Supreme Court and this court have indicated repeatedly, the government may decline to subsidize private religious speech when doing so would violate the Establishment Clause, or, put another way, avoiding a violation of the Establishment Clause is a sufficiently compelling reason to justify government's exclusion of certain private speech in a forum otherwise dedicated to communicative activity.[12] *See, e.g., Rosen-*

---

12. For the same reason, we need not determine whether the Civic Events Fund's exclusion for events directly supporting a religious organization is in fact viewpoint discriminatory or, instead, is more accurately character-ized as a content or identity distinction, because the Establishment Clause justification would suffice even if the exclusion is viewpoint discriminatory.

*berger,* 515 U.S. at 837, 115 S.Ct. 2510; *Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 761–62, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995);[13] *Lamb's Chapel,* 508 U.S. at 394, 113 S.Ct. 2141; *Widmar,* 454 U.S. at 271, 102 S.Ct. 269; *Cole v. Oroville Union High Sch. Dist.,* 228 F.3d 1092, 1101 (9th Cir.2000), *pet. for cert. filed* Jan. 2, 2001; *cf. Tucker,* 97 F.3d at 1212. We therefore agree with the district court that if the City's Establishment Clause justification for the Civic Events Fund's religious exclusion is valid, then the exclusion is valid as well.[14] It is to the Establishment Clause inquiry, therefore, that we now direct our attention.

## II. The Establishment Clause

To embark on that inquiry, however, is not necessarily to simplify matters greatly, for modern Establishment Clause jurisprudence is famously indistinct. As a recent summary of the last century's Religion Clause cases put it:

> The Supreme Court is presently split closely on almost all important issues of ... separation of church and state.... Resolution of difficult issues in this area "depends on the hard task of judging-sifting through the details.... Such judgment requires courts to draw lines, sometimes quite fine, based on the particular facts of each case." [*Rosenberger,* 515 U.S. at 847, 115 S.Ct. 2510 (O'Connor, J., concurring)]. As a consequence of these realities, the current development of the law provides more themes than categorical principles, with little doctrinal stability.

Jesse H. Choper, *A Century of Religious Freedom,* 88 Cal. L.Rev. 1709, 1741 (2000). The most propitious approach to the perplexities of Establishment Clause doctrine, we have concluded, is to begin by examining three of the Establishment Clause "themes" involved both in *Rosenberger,* the case on which the Gentalas most heavily rely and which is indeed quite similar to this one in many respects, and in this case as well. We then turn to the details of Tucson's Civic Events program to see why, as we hold, the Establishment Clause considerations play out differently on the facts of this case than they did in *Rosenberger.*

### A. Establishment Clause Analysis in *Rosenberger* and Thereafter

In *Rosenberger,* the Supreme Court examined a Student Activities Fund ("Activities Fund") program at the University of Virginia to determine whether Wide Awake Productions, an evangelical student-written newspaper otherwise eligible for an Activities Fund subsidy to cover its printing costs, could be denied the subsidy because the publication constituted a "religious activity." The Activities Fund was financed through mandatory student activity fees; qualified student groups were required to submit their bills to the Student Council for payment from the Activities Fund. 515 U.S. at 824, 115 S.Ct. 2510. The Court concluded that the Activities Fund was, for purposes of Free Speech Clause analysis, a designated public forum, albeit "a forum more in a metaphysical than in a spatial or geographic sense," from which the University could not ex-

---

**13.** As the *Capitol Square* Court explained in analyzing whether a city could bar a private group's placement of a cross in a public square: "There is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech." 515 U.S. at 761–62, 115 S.Ct. 2440. Given *Capitol Square*'s factual context and the Court's citation to *Lamb's Chapel* and *Widmar* for the just-stated principle, the *Capitol Square* Court plainly meant that private religious expression in a public forum, however defined, *see* n.11, *supra,* not only is protected by the Free

Speech Clause, but also is subject to the constraints of the Establishment Clause.

**14.** We note that the considerations just canvassed in summarizing the competing free speech arguments do become pertinent to our Establishment Clause analysis, for they are informative in determining the degree to which the City's Fund program constitutes an endorsement of the private speech involved, a key Establishment Clause consideration. *See Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); *see also* pp. 1079–81, *infra.*

clude speakers based upon their viewpoint. *Id.* at 830–31, 115 S.Ct. 2510. After determining that the exclusion of Wide Awake Productions was based on its Christian viewpoint rather than on its content, the Court held that, absent a compelling justification, denying Activities Fund support to Wide Awake would be a denial of the First Amendment's Free Speech guarantee. *Id.* at 837, 115 S.Ct. 2510. The Court then turned, as we have turned here, to the question whether the exclusion "is excused by the necessity of complying with the Constitution's prohibition against state establishment of religion." *Id.*

In doing so, the Court discussed three considerations that have been of great importance in recent Establishment Clause analysis, each of which has been further developed in subsequent cases:

*First,* the majority opinion in *Rosenberger* emphasized that the Student Activities Fund program, if revised to include religiously-oriented publications, would not single out religion for special benefits, but, instead, would be "neutral toward religion." 515 U.S. at 840, 115 S.Ct. 2510. At the same time, the Court in *Rosenberger* did not rest on the neutrality consideration. Instead, the Court observed that Establishment Clause analysis, as in comparable cases, turned not only on "general principles," *id.* at 839, 115 S.Ct. 2510, namely the Activities Fund's neutrality toward religion, but also on other "practical details of the program's operation." *Id.*

■ Moreover, neutrality is merely "one hallmark of the Establishment Clause," as Justice O'Connor convincingly explained in *Rosenberger,* 515 U.S. at 846, 115 S.Ct. 2510 (O'Connor, J., concurring):

Our cases have permitted some government funding of secular functions performed by sectarian organizations. [citations omitted]. These decisions, however, provide no precedent for the use of public funds to finance religious activities.

This case lies at the intersection of the principle of government neutrality and the prohibition on state funding of reli-

gious activities.... Not to finance Wide Awake, according to petitioners, violates the principle of neutrality by sending a message of hostility toward religion. To finance Wide Awake, argues the University, violates the prohibition on direct state funding of religious activities.

When two bedrock principles so conflict, understandably neither can provide the definitive answer. Reliance on categorical platitudes is unavailing.

*Id.* at 847, 115 S.Ct. 2510.

Since *Rosenberger,* the Supreme Court has continued to struggle mightily over the question whether neutrality toward religion is sufficient, or nearly sufficient, to justify government subsidies of core religious activity, whatever else may be the case. A majority of the Court, however, made quite clear last term, if it was not clear before, that, although neutrality is an important consideration in Establishment Clause cases, that consideration alone is not determinative where government subsidy of religious activity is concerned.

Thus, Justice Souter, writing for three justices, after first reviewing at length the history of the neutrality concept in Establishment Clause jurisprudence, *Mitchell v. Helms,* 530 U.S. 793, 120 S.Ct. 2530, 2578–81, 147 L.Ed.2d 660 (2000) (Souter, J., dissenting), stated:

"Neutrality" [meaning] generality or evenhandedness of distribution ... is relevant ... but this neutrality is not alone sufficient to qualify the [government] aid as constitutional. It has to be considered only along with other characteristics of aid, its administration, its recipients, or its potential that have been emphasized over the years as indicators of just how religious the intent and effect of a given aid scheme really is.

*Id.* at 2581. Similarly, in her opinion for two justices in *Mitchell, id.* at 2557 (O'Connor, J., concurring in the judgment), Justice O'Connor decisively reiterated the position she took in her *Rosenberger* concurrence against neutrality as *the* deter-

mining factor in Establishment Clause cases, stating: "[N]eutrality is important but it is by no means the only 'axiom in the history and precedent of the Establishment Clause.' *Rosenberger*, [515 U.S. at 846, 115 S.Ct. at 2525 (O'Connor, J., concurring).] ... [N]eutrality is not alone sufficient to qualify the aid as constitutional."

We are left, then, with the clear holding by a Supreme Court majority that when the government subsidizes religious activity, the fact that it is doing so pursuant to a program that treats religious speech or association coequally with other speech or association is not, standing alone, determinative in Establishment Clause analysis. Instead, we are obligated to consider other factors in determining whether the connection between the government subsidy and the religious activity is such as to violate the concerns underlying the Establishment Clause (including, most importantly, the two we next discuss).[15]

*Second*, the central concern making *Rosenberger* a close and difficult case was that the subsidy to religious expression involved was not simply the use of government space, generally open to the public or to some subgroup thereof for expressive activity, *see Lamb's Chapel*, 508 U.S. at 395, 113 S.Ct. 2141; *Widmar*, 454 U.S. at 271–72 & n. 12, 102 S.Ct. 269, but a form of governmental financial support for religious activity. The *Rosenberger* Court, far from discounting this consideration, recognized that "[t]he Court of Appeals (and the dissent) are correct to extract from our decisions the principle that we have recognized special Establishment Clause dangers where the government makes direct money payments to sectarian institutions." 515 U.S. at 842, 115 S.Ct. 2510. And indeed, the prohibition on funding religious activities has been preeminent among establishment of religion concerns, depending upon one's view of history, from the nation's infancy, *see id.* at 868–76, 115 S.Ct. 2510 (Souter, J., dissenting); *see also id.* at 846–47, 115 S.Ct. 2510 (O'Connor, J., concurring) (agreeing that the "axiom" that " '[p]ublic funds may not be used to endorse the religious messages' " [citation omitted] has long been a "bedrock" of Establishment Clause jurisprudence); *compare id.* at 853–63, 115 S.Ct. 2510 (Thomas, J., concurring), or, at least, since *Everson v. Board of Education*, 330 U.S. 1, 17–18, 67 S.Ct. 504, ·91 L.Ed. 711 (1941) ("No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion.").[16]

*Rosenberger* explicitly so recognized, noting that "if the State pays a church's bills it is subsidizing it, and we must guard against this abuse." 515 U.S. at 844, 115 S.Ct. 2510. The *Rosenberger* Court nonetheless held, for several reasons, that the

15. Judge Fernandez argues in dissent that because the City's Fund policy is not neutral toward, but expressly excludes, religious organizations, it necessarily goes beyond what the Establishment Clause requires. As just discussed, however, while Judge Fernandez' position that neutrality toward religion is all that matters has been advocated by a plurality of the Court, five justices decisively rejected that position in *Mitchell*.

16. It is worth noting, because the distinction becomes lost on occasion, that the funding concern and the endorsement concern next discussed, while overlapping in some respects, are not one and the same, nor is one a subcategory of the other. The funding concern centers in large part on the interest of citizens in resisting coercion to subsidize religious ideas in which they disbelieve. *See, e.g., Flast v. Cohen*, 392 U.S. 83, 103–04, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Everson*, 330 U.S. at 15–16, 67 S.Ct. 504. The endorsement concern, in contrast, centers upon the disturbance of civic society that occurs when the government appears publicly to favor one religion over another, or religion over nonreligion. *See, e.g., Santa Fe*, 120 S.Ct. at 2278; *Capitol Square*, 515 U.S. at 779, 115 S.Ct. 2440. The funding factor would have force, for example, even if the government kept secret the fact that tax funds were being funneled directly to churches to finance their services, while the endorsement "theme" would be of concern if the government proclaimed an official religion without providing its adherents any funding at all.

funding prohibition was not of controlling importance in that case, emphasizing that: (1) the mandatory fees comprising the Activities Fund were an "exaction upon the students," not "a general tax designed to raise revenue for the University,"[17] *id.* at 840–41, 115 S.Ct. 2510; *see also id.* at 841, 115 S.Ct. 2510 (" 'A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the Government.' " (quoting *United States v. Butler*, 297 U.S. 1, 61, 56 S.Ct. 312, 80 L.Ed. 477 (1936))); *id.* ("Our decision, then, cannot be read as addressing an expenditure from a general tax fund."); *id.* at 851–52, 115 S.Ct. 2510 (O'Connor, J., concurring); (2) Wide Awake was a "student publication[,] ... not a religious institution, at least in the usual sense of that term as used in our case law," so that, in paying Wide Awake's bills, the University was not paying the bills of a church or similar organization, *id.* at 844, 115 S.Ct. 2510;[18] (3) the activity funded did not involve "religious exercises," *id.* at 842, 115 S.Ct. 2510; and (4) the benefit provided did not involve direct funding of religious speech, since the University did not provide eligible student groups with direct financial assistance but instead paid their printing bills. *Id.* at 842–44, 115 S.Ct. 2510.

*Third,* also prominent in *Rosenberger* was the concern that subsidizing Wide Awake's religiously-oriented publication could be perceived as a governmental endorsement of the religious ideas propounded by its student editors. The Court recognized that the Establishment Clause forbids " '*government* speech endorsing religion,' " 515 U.S. at 841, 115 S.Ct. 2510 (quoting *Board of Educ. of Westside Cmty. Schs. (Dist. 66) v. Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion) (emphasis in original)), but concluded that, "[i]n this case, 'the government has not fostered or encouraged' any mistaken impression that the student newspapers speak for the University." 515 U.S. at 841, 115 S.Ct. 2510 (quoting *Capitol Square*, 515 U.S. at 766, 115 S.Ct. 2440). In particular, the Court noted that "[t]he University has taken pains to disassociate itself from the private speech involved in this case," *Rosenberger*, 515 U.S. at 841, 115 S.Ct. 2510; for example, the University required all recognized student organizations to sign an agreement stating that the recognition does not signal University "approval of the organizations' goals or activities," and also required each publication to include the statement that it was independent of the University, and that the University was not responsible for its actions. *Id.* at 824, 115 S.Ct. 2510; *id.* at 849, 115 S.Ct. 2510 (O'Connor, J., concurring). Given this agreement and disclaimer, as well as the fact that Wide Awake competed with many other Activities Fund-supported publications for the University community's attention, it was extremely unlikely that observers would perceive that the University was endorsing the views put forward in *Wide Awake.*

Since *Rosenberger,* the precise nature of the Establishment Clause endorsement inquiry, like the role of the neutrality principle, has been clarified. *Santa Fe* centered on the endorsement question, stressing that the concern underlying the endorse-

---

**17.** In other contexts as well, the Supreme Court has repeatedly emphasized the distinction between general taxes and mandatory fees levied on a select group of people to support activities in their common interest. *See Glickman v. Wileman Bros. & Elliott,* 521 U.S. 457, 469–70, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997); *Keller v. State Bar of Cal.,* 496 U.S. 1, 12–13, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990); *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 259 n. 13, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).

**18.** The policy at issue in *Rosenberger* did not permit use of the Activities Fund to subsidize "religious organizations," defined as organizations "whose purpose is to practice a devotion to an acknowledged ultimate reality or deity." 515 U.S. at 826, 115 S.Ct. 2510. The Court ascribed considerable significance to the fact that the University did not contend that Wide Awake was a "religious organization" under its definition. *Id.* at 844, 115 S.Ct. 2510.

ment inquiry is that governmental identification with religious speech or worship communicates to nonadherents "that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." 120 S.Ct. at 2279.[19] To determine whether a government subsidy to religion constitutes "actual or perceived endorsement," the Court stressed, requires a highly fact-specific inquiry, directed at the question "whether an objective observer, acquainted with the text, ... history, and implementation of the [program] would perceive it as a state endorsement" of religious observance. *Id.* at 2278.

*Rosenberger* and the Court's post-*Rosenberger* cases, then, provide a modicum of theoretical insight into the applicable Establishment Clause "themes," and, more usefully perhaps, substantial practical insight into the specific factors most likely to be informative as we focus our attention on the interaction among these various considerations in the circumstances of this case.

## B. "Sifting Through the Details"

■ As the foregoing analysis suggests, cases of this kind-that is, those at the intersection of the Free Speech and Establishment Clauses-are ones in which the admonition that Establishment Clause "jurisprudence ... is of necessity one of line-drawing," *Lee v. Weisman*, 505 U.S. 577, 598, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), has particular force. Turning to the line-drawing task, we conclude that this case involves significant factual differences from *Rosenberger* in matters that were deemed important to that case's Establishment Clause analysis. There are also some contextual matters that we deem to be important but that had no counterpart in *Rosenberger*. The upshot is that,

looking at these factors as a whole, we conclude that in this case, the public funding and government endorsement considerations considerably overwhelm the neutrality consideration, and lead us to the conclusion that Tucson's Establishment Clause justification for its religious organization exclusion is valid.

### (1) Tax-based funding of religious organization

Considering the governmental funding of religion, there are a number of factors that are precisely opposite in this case from a factor deemed important in *Rosenberger*. Here, the source of the Civic Events Fund moneys includes general tax revenue, not simply fees levied against a discrete group of citizens. Also, Tucson excludes funding only for events supporting religious organizations, and the Prayer Committee is preeminently a religious organization; Wide Awake, in contrast, was a student newspaper with a religious viewpoint, not an "organization whose purpose is to *practice a devotion* to an acknowledged ultimate reality or deity." *Rosenberger*, 515 U.S. at 840, 115 S.Ct. 2510 (quoting the university's definition of "religious organization") (emphasis added). Further, the activity funded here was a participatory religious service, led by ministers and consisting primarily of prayer, not a written document, however proselytizing. Unless we are to believe that the *Rosenberger* Court's explicit reliance on each of these three considerations was without significance, we must conclude that in this case, unlike in *Rosenberger*, Civic Events Fund subsidies of the Prayer Day and similar events would be tantamount to "the State pay[ing] a church's bills." *Id.* at 844.

Moreover, Tucson's administration of its Civic Events Fund involves considerably

---

**19.** *Santa Fe* concerned the offering of pregame prayers over a high school's public address system at school football games. Applying the endorsement analysis, the Court determined that, although the prayer was delivered by a student selected by other students, in the atmosphere of school sponsorship inherent in the setting, "an objective Santa Fe High School student [would] unquestionably perceive the inevitable pregame prayer as stamped with her school's seal of approval." 120 S.Ct. at 2278, 120 S.Ct. 2266.

more discretionary decisionmaking than did the university's administration of the Activities Fund in *Rosenberger.* Here, the City has retained a good deal of subjective discretion concerning which events to fund, including establishing fairly general substantive criteria, criteria relating to the organization's (and the Fund's) financial circumstances, criteria related to whether the event is a first-time or ongoing event, and criteria concerning the likely appeal of the event to the citizenry. That most nonprofit organizations' events are nonetheless funded does not detract from the fact that City officials do in fact review each application and make a decision using City-established criteria, that some applications *are* denied, and that the very existence of multiple criteria for funding likely leads to self-selection by otherwise eligible organizations. As a result, one cannot escape the conclusion, in this case, that it is the City making the choice which events to fund, a circumstance that, the Supreme Court has suggested, greatly exacerbates the significance of the tax-based derivation of the funding. *See Mitchell,* 120 S.Ct. at 2541–43 (plurality opinion) (stressing the importance of private, as opposed to governmental, funding choices as to whether tax-derived funds will be used by a religious institution pursuant to a program neutrally available to secular as well as religious institutions); *id.* at 2558–59 (O'Connor, J., concurring) (agreeing with the plurality's stress on the importance of private choice, but maintaining that the private choice must be a true, individual choice, not a governmentally-prescribed aid formula).

Finally, we note that Tucson's exclusion for events in direct support of religious organizations appears to apply principally where, as here, the event will raise money from attendees that could be used to fund the organization in the future. The Gentalas, for example, explained their need for City funding in part by their desire to generate a surplus from the "free will offering." There is therefore the additional concern, not present in *Rosenberger* or in any other case concerning governmental

funding of religious activity of which we are aware, that although the subsidy provided is in-kind and in that sense indirect, it is intended for use effectively as seed money to generate other, non-earmarked funds for the religious organization. The exclusion for events "in direct support of religious organizations" therefore functions similarly to a prohibition on cash grants to religious organizations. *Rosenberger,* 515 U.S. at 842, 115 S.Ct. 2510.

## (2) City Endorsement of Religion

Turning to the question "whether an objective observer, acquainted with the text, ... history, and implementation of the [program] would perceive it as a state endorsement" of any religious observance funded, *Santa Fe,* 120 S.Ct. at 2279, we conclude that there are considerably more reasons that such an observer would so conclude regarding Tucson's Civic Events Fund than there were in *Rosenberger.*

Here, the subsidy often includes, as it would have for the Prayer Day event, the on-site, observable presence of city employees, not simply the behind-the-scenes payment of bills from private vendors, as in *Rosenberger.* Moreover, the equipment used—microphones, lighting systems, tables, public address systems—is city-owned and is likely to be quite visible to onlookers during the event.

Additionally, the detailed, subjective funding criteria discussed above, as well as the role of the Mayor and Council in establishing and applying those criteria, would contribute to an informed observer's impression that an event that survives the review process is one that the City affirmatively endorses. Contributing to that impression would be the fact that many, probably most, events in the parks do have to pay the prescribed fees because they are not eligible for Civic Events Fund designation. In short, the City has retained a role for itself something like that of impresario, selecting the events that are consistent with the image of Tucson that

the City wishes to foster and that therefore merit public subsidy.

Consistent with the impression created by the funding process, the City's policy and application form make clear that the Civic Events Fund program is *meant* to endorse some events as "Civic Events" worthy of the City's imprimatur. A person acquainted with the funding program's text, history, and implementation would know, for example, that the governing policy statement expressly states that "[t]he Mayor and Council *encourage and support* Civic Events," (emphasis added), which are then described by category; that the phrase "Civic Events" is always capitalized in the policy statement even when no funding is at issue, indicating a city-conferred title or status; and that organizers of funded events are directed to deal with a city official denominated the "Civic Event Coordinator" in order to "obtain assistance in coordinating the event." Of a piece with these other indicia of endorsement is the additional, significant requirement that, far from declaring their independence from the government funder as in *Rosenberger*, organizers of Civic Events Fund-subsidized events must call attention to the City's supportive role both in pre-event advertising and at the event itself.

It is true, as the district court noted in discounting the significance of the latter point, that the City could simply remove this acknowledgment requirement if it chose. That observation is not pertinent to our analysis, for two related reasons.

First, as the other factors summarized above indicate, the express acknowledgment requirement simply confirms the overall nature of the Civic Events program as one in which the City affirmatively supports certain privately-originated events. The acknowledgment requirement does not itself create that relationship. To require the City to hide its true relationship to the event would not alter that relationship, but instead, would only mislead the public.

Second, the courts are not in the business of designing governmental programs but, instead, of taking them as they find them and determining their constitutional significance. Thus, for example, the Court in *Forbes*, 523 U.S. 666, 118 S.Ct. 1633, 140 L.Ed.2d 875, did not direct the government henceforth to run its broadcasting stations on an open microphone basis so as to avoid editorial decisions but, instead, viewed the broadcasting program as one in which editorial decisions were important and came to its conclusions about the Free Speech rights of those seeking access to the broadcasting station accordingly. Nor did the Court solve the knotty Free Speech issues regarding government funding for the arts involved in *Finley*, 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500, by informing the government that it should fund the arts on a first-come-first-served basis. *See id.* at 598, 118 S.Ct. 2168 (Scalia, J., concurring in the judgment) ("It is the very business of government to favor and disfavor points of view on ... innumerable subjects.... [Government] further[s] [a] favored point of view by achieving it directly, ... by advocating it officially, ... or by giving money to others who achieve and advocate it."); *Downs*, 228 F.3d at 1013–14. To require Tucson to drop its express support of preferred community events in favor of an objective, hands-off funding system in order that events in direct support of religious organizations could be funded would be to require the City to abandon its present program and substitute a different one, a ukase beyond our authority as a court.

■ We note, as well, that the nature of Tucson's Civic Events Fund program is such that allowing various religious organizations to compete for funding would lead to some of the very dangers the Establishment Clause was intended to prevent. For one thing, in order to comply with the City's emphatically secular criteria for funding, religious event organizers would be likely to "secularize" their events. *Lee*, 505 U.S. at 608, 112 S.Ct. 2649 (Blackmun, J., concurring). Although the focus on the

community's "historical, cultural, and ethnic heritage," "critical issues," and "civic pride" may be commendable, creating an incentive to structure religious events toward such worldly objectives would encourage the dilution of spiritual life, not enhance it. And while fairly small sums are at issue here, the Establishment Clause principles examined above admit no distinction between large grants to religion and small ones.

Further, the necessity of applying subjective substantive criteria could result in the City impermissibly promoting some faiths over others. *Lee,* 505 U.S. at 627, 112 S.Ct. 2649 (Souter, J., concurring); *Everson,* 330 U.S. at 15, 67 S.Ct. 504. Some religions are likely to have more "broad community appeal" than others, or to "contribute to tourism" more readily. Concerns about the dangers of such government favoritism to the cohesiveness of civil society echo down from the Framers to the Supreme Court's most recent jurisprudence. *Compare* James Madison, *Memorial and Remonstrance Against Religious Assessments,* ¶ 9 (1785) (observing that government favoritism toward certain faiths "degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority"), *with Santa Fe,* 120 S.Ct. at 2279 (noting that government sponsorship of a religious message communicates to nonadherents " 'that they are outsiders, not full members of the political community' " (quoting *Lynch v. Donnelly,* 465 U.S. 668, 688, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring))).

The short of the matter is that, after "sifting through the details," we are convinced, first, that this case and *Rosenberger,* for all their superficial similarity, are different in most of the details that matter for Establishment Clause purposes, and, second, that all of the ways in which they differ point toward an Establishment Clause violation in this case.[20]

### C. Relevance of Free Exercise Clause to the Establishment Clause

One final point: We do not agree that, as Judge Fernandez' dissenting opinion maintains, Free Exercise Clause considerations require that we alter our Establishment Clause analysis.

■■ Denying financial subsidies to religious organizations does not, standing alone, substantially burden Free Exercise rights. As the Supreme Court observed in *Bob Jones University v. United States,* 461 U.S. 574, 603–04, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), religious schools' ineligibility for a tax exemption due to their racially discriminatory practices might impose significant burdens on their operations, but any such administrative burdens would "not prevent those schools from observing their religious tenets." *See also Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (denial of tax deduction not a Free Exercise Clause violation); *Swaggart Ministries v. California Dep't of Equalization,* 493 U.S. 378, 391–92, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) (same).

---

**20.** Judge Kleinfeld suggests, in his dissent, that the record as it stands is inadequate to decide the issues before us. We disagree.

Judge Kleinfeld treats the factual question whether the City was in practice selective in expending Civic Events Fund moneys as all-important, accuses us of "believ[ing] that the very fact that some applications are denied is enough to decide this case," (*post,* at 1086), and then notes that the record contains limited information on the denial-rate question. But we do not agree that the actual selectivity question is determinative. Rather, as the above analysis indicates, that some applications are denied is pertinent only because that fact tends to confirm that the city is doing what its program documents in no uncertain terms state that it is doing, namely, affirmatively promoting certain events as city-endorsed and approved. The other indices of endorsement, surveyed in the text, are sufficient to raise Establishment Clause concerns even if, in a given year, the City determines that all applicants for Civic Events Fund support meet the requisite, detailed criteria for funding and that sufficient funding is available for all of them.

Here, the claim of denial of Free Exercise rights is particularly weak. The Gentalas have made no showing that their ability to worship as they choose has been discernibly burdened by the operation of the Civic Events program. Rather, the Prayer Committee staged a well-attended prayer service in a City-provided location, the Reid Park bandshell. *See Collins v. Chandler Unified Sch. Dist.*, 644 F.2d 759, 763 (9th Cir.1981). In Free Exercise terms, then, the government's denial of a financial subsidy for microphones and lights to a religious group is a far cry from its outright prohibition of the group's religious practice. *Cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (holding that ordinance prohibiting a religious group's ritual violated the Free Exercise Clause).

Moreover, the refusal to fund the Prayer Committee's microphones and lighting is also a far cry from denying a religious organization or event services essential to survival in civil society, such as police and fire protection. Police and fire protections are vital public services to which all citizens enjoy a basic entitlement. Denying such services to a particular group of citizens would both evince government hostility and threaten the group's ability to exist. The same simply cannot be said of Tucson's program, a subsidy for items such as microphones and stage lights for special events, available only to a limited set of potential users and in no way necessary for survival in the modern world. Indeed, if the failure to subsidize a religious activity with regard to expenditures that are in no way analogous to basic public safety services violated the Free Exercise Clause, the Court would have said so in *Rosenberger* and written a very different, and much shorter, opinion.

We therefore conclude that Tucson was correct that it could not provide funding to "events in direct support of religious orga-

nizations" generally, or to the Prayer Day event in particular, without violating its constitutional obligations regarding the separation of church and state.

### Conclusion

Because we agree with the City that its policy is mandated by the Establishment Clause, we need not reach the question that the City raises on cross-appeal: whether the district court should have granted the City leave to amend its answer to add an affirmative defense derived from the Arizona Constitution's religion clauses.[21] The federal Constitution provides all the defense Tucson needed in this lawsuit. We affirm the district court in all respects.

AFFIRMED.

FERNANDEZ, Circuit Judge, dissenting:

As I see it, this case is not about speech, or viewpoints of speakers, at all. It is solely about outright discrimination against religious organizations. As such, it does violate the First Amendment, but not the clause which precludes government from "abridging the freedom of speech." Rather, it violates the clauses which command that government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." As I shall explain, that does not make the law any less malignant.

Because it is where the City of Tucson (as well as the majority) starts, I shall first address the speech issue, and in so doing I shall begin with the City's "Civic Event Policy Statement and Evaluation Criteria." That is both inclusive and exclusive. It provides for City support of civic events which either "celebrate and commemorate the historical, cultural and ethnic heritage of the City and the nation, or increase the community's knowledge and understanding of critical issues," or "generate broad appeal and participation," or "instill civic

---

**21.** We affirm the decision below on the insurance issue for the reasons stated by the district court.

pride," or "contribute to tourism," or "are identified as unique community events." A large menu of choices of great breadth! The support of those events does *not* come in the form of cash paid to the sponsoring organizations; it comes in the form of accounting transfers within the City's departments to defray such "typical event-related services" as police protection, clean up (including street sweeping), use of park event equipment, and the like.

A wide array of non-profit organizations, indeed almost all of them, can participate. The only types of organizations excluded at the threshold are those that are receiving a special City benefit already, and religious organizations. As the policy puts it, "events held in direct support of religious organizations" are *not* eligible for support.

The parties spill a great deal of ink over whether the fund thus created is a forum and, if so, just what type of forum it is. The purpose of that liquid flood is to decide just what restrictions the City can place upon speech, if any. Of course, it is a commonplace that the government can have, and sponsor, a restrictive viewpoint, if it is the speaker. *See, e.g., Rust v. Sullivan,* 500 U.S. 173, 192–200, 111 S.Ct. 1759, 1771–76, 114 L.Ed.2d 233 (1991); *Downs v. Los Angeles Unified School District,* 228 F.3d 1003, 1013–16 (9th Cir. 2000); *cf. Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569, 586–88, 118 S.Ct. 2168, 2178–79, 141 L.Ed.2d 500 (1998) (grants need not be entirely neutral); *Regan v. Taxation With Representation,* 461 U.S. 540, 544–51, 103 S.Ct. 1997, 2000–04, 76 L.Ed.2d 129 (1983) (government can choose not to subsidize lobbying with tax exemptions). On the other hand, if some sort of forum is created, the government cannot "discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 2517, 132 L.Ed.2d 700 (1995). Rather, the government's restrictions on speech must remain reasonable and viewpoint neutral. *See Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 392–93, 113 S.Ct. 2141, 2147, 124 L.Ed.2d 352 (1993). Not surprisingly, that includes religious speech and viewpoints. *Cf. Widmar v. Vincent,* 454 U.S. 263, 269, 277, 102 S.Ct. 269, 274, 278, 70 L.Ed.2d 440 (1981) (content based restrictions on religious speech were not reasonable). The tour through the debates in this area is, and always has been, an extremely exciting excursion, but in the context of this case its relevance is equally exiguous. In fact, the policy at hand does not key on the viewpoint of the speaker at all.

A careful reading of the policy makes it clear that what the City has decreed is that an event cannot directly benefit a religious organization. So, for example, if a religious organization put on a perfectly secular play for the entertainment of the public—say "Pygmalion"—and derived some benefit from that, consideration for support would be precluded at the threshold. That would not, one presumes, be because of the viewpoint of George Bernard Shaw or of the performers of the play. It would be because a religious organization was deriving direct support from it. On the other hand, if a secular non-profit organization put on a prayer program, even one solely and generally Christian, consideration for support would not be precluded. Certainly it could not be said that something as broad as a general chiliastic prayer would directly support any religious organization. Again, the lack of a threshold exclusion would not depend on the viewpoint of the speakers. In short, I think it is a mistake to fassick in the fields of freedom of speech. What we must do, instead, is turn our gaze on the hostility to religious organizations which is expressed by the policy in question.

As I have written before, "the Supreme Court [has] reminded us that laws of general application do not run afoul of the religion clauses; rather, those clauses assume and require an evenhanded neutrality both toward and on behalf of religious belief." *Goehring v. Brophy,* 94 F.3d 1294,

1306–07 (9th Cir.1996) (Fernandez, J., concurring); *see also Walker v. San Francisco Unified Sch. Dist.*, 46 F.3d 1449, 1470 (9th Cir.1995) (Fernandez, J., concurring and dissenting) ("I . . . applaud the majority's overall analysis, which ultimately looks upon the establishment clause as a kind of equal protection clause. . . ."). But hostility is obviously anathema where neutrality is required. As the Supreme Court has cogently put it, "government may not . . . impose special disabilities on the basis of religious views or religious status." *Employment Div., Dept. of Human Resources v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990). While government regulations and programs may interfere with the particular beliefs of some citizens, the religion clauses do not bar "application of a neutral, generally applicable law to religiously motivated action." *Id.* at 881, 110 S.Ct. at 1601. Of course, it must be admitted that some laws which affect religion might be unconstitutional, even though they are neutral, but that is simply because they would be unconstitutional anyway—for example, a law restricting religious speech may well be unconstitutional because it is restricting speech, and it would be just as unconstitutional if the speech were not religious. *See id.* at 881–82, 110 S.Ct. at 1601–02; *see also Board of Educ. v. Barnette*, 319 U.S. 624, 634–642, 63 S.Ct. 1178, 1183, 1187, 87 L.Ed. 1628 (1943) (Jehovah's Witnesses children are not required to participate in flag salute. That does not "turn on one's possession of particular religious views;" it turns on First Amendment limitations which preclude governmental invasion of "the sphere of intellect and spirit."). But I digress. The law at hand is not some apparently benign enactment that happens to touch on someone's religious beliefs. It is, instead, a law aimed directly at religious organizations as such.

In that respect, the policy in question is more like the law that confronted the Supreme Court in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). There the target was really a single religion, but the government is no more benignant when it targets all religions. As Justice Kennedy said:

> In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. . . . A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.

*Id.* at 531–32, 113 S.Ct. at 2226. And the Court went on to point out that:

> A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance "interests of the highest order" and must be narrowly tailored in pursuit of those interests.

*Id.* at 546, 113 S.Ct. at 2233 (citation omitted).

Of course, I recognize that the policy in question here does not impose a direct restriction on religious organizations; it simply denies a benefit that is available to virtually everyone else. To my mind, that is a distinction without a difference. It may well be that the government has a great deal of discretion when it grants benefits, and also attempts to distance itself from religion and the religious traditions of the American people. But as the Supreme Court has said, any state interest "in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution . . . is limited by the Free Exercise Clause. . . ." *Widmar*, 454 U.S. at 276, 102 S.Ct. at 277.

While it has never been called upon to rule directly on the question, the Court has often expressed its incredulity at any sug-

gestion that the Establishment Clause prohibits the extension of general public benefits to religious groups. That feeling is a recurrent theme. As the Court has often stated in varying ways, were it otherwise, "a church could not be protected by the police and fire departments, or have its public sidewalks kept in repair." *Roemer v. Board of Pub. Works,* 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976); *see also Widmar,* 454 U.S. at 274–75, 102 S.Ct. at 277; *cf. Walz v. Tax Comm'n,* 397 U.S. 664, 672–75, 90 S.Ct. 1409, 1413–15, 25 L.Ed.2d 697 (1970) (granting of tax exemptions to churches does not violate the Establishment Clause any more than granting police and fire protection does).

But the City in its anxiety to avoid establishment problems has done just what the neutral demands of the religion clauses refuse to allow; it has run afoul of the Free Exercise Clause while it was at it. The City has done something very like denying police and fire protection to churches. It has allowed all other non-profit organizations (except those that it already subsidizes) to cross the threshold that gives them the possibility of participation in a fund which allows the use of city facilities and services at no additional cost, but it has excluded religious organizations from those benefits. It is as if the City charged religious organizations, and only religious organizations, when firemen or policemen came to their facilities, or for

the repair of sidewalks, or for the use or cleaning of roadways. That cannot be and is not constitutional. As the Supreme Court said over 50 years ago:

> [S]uch is obviously not the purpose of the First Amendment. That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions, than it is to favor them.

*Everson v. Board of Educ.,* 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947). The City's policy does handicap religious organizations by refusing to treat them in the way that it treats all other non-profit organizations.[1]

Religious organizations are not cankers on an otherwise healthy body politic. On the contrary, they tend to infuse us with all that is best in human nature and history, and they help prevent our democracy from becoming a kakistocracy. They should not be treated with hostility out of bigotry,[2] or out of misguided constitutional affection, or out of fear of offending someone. They should be treated with neutrality. The Supreme Court has said that government can sometimes act with a "benevolent neutrality." *Walz,* 397 U.S. at 676, 90 S.Ct. at 1415. It has never suggested that government can act with a

---

**1.** I recognize that for us in the lower courts *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), still walks, or stalks, the land. *See Bollard v. California Province of the Soc'ty of Jesus,* 196 F.3d 940, 948 (9th Cir.1999); *cf. Lamb's Chapel,* 508 U.S. at 398 400, 113 S.Ct. at 2149–50 (Scalia, J., concurring). But the *Lemon* test surely does not save this ordinance, for, if anything, the ordinance does inhibit religion by discriminating against religious organizations. *See Lemon,* 403 U.S. at 612, 91 S.Ct. at 2111. And if we ask, instead, if the Establishment Clause would be violated were it not for the threshold discrimination provision, the answer is no. The policy, in general, has a secular purpose, would not primarily advance or inhibit religion, and would not entangle government with religion. *Id.* at 612–13, 91

S.Ct. at 2111. Nor, by the way, is there any "realistic danger that the community would think that the [City] was endorsing religion." *See Lamb's Chapel,* 508 U.S. at 395, 113 S.Ct. at 2148. Finally, the statement in the application for benefits form that requires an applicant to acknowledge the City's contribution of services makes no difference because every recipient of those services must so acknowledge. If the statement did present a problem, I hardly think that the City can place a tarnkappe over the policy's reification of hostility at the threshold by adding that requirement. The concrete fact of improper discrimination against religious organizations remains quite visible.

**2.** *See Mitchell v. Helms,* 530 U.S. 793, 120 S.Ct. 2530, 2551–52, 147 L.Ed.2d 660 (2000).

malevolent one. The blessings of our Constitution do not stop short of religion.

Thus, I respectfully dissent.

KLEINFELD, Circuit Judge, with whom WARDLAW, Circuit Judge, joins, Dissenting:

I respectfully dissent. Before denying a permanent injunction, the district court should have obtained additional evidence and made findings of fact.

Tucson has a city park and band shell, generally available to all organizations, including religious organizations, for their events. For most non-profit organizations, if the event serves any of a broad range of civic goals, the city waives charges that it would otherwise impose for in-kind services. The charges are for such municipal services as "refuse containers, street sweeping, ... police services ..." and use of the sound system at the band shell. The city does not write checks to the organizations; what is at issue is whether it demands checks from them. The city's written policy denotes three situations where the charges are not waived: (1) events hosted by organizations the city otherwise funds; (2) events put on by organizations allowed to occupy city property without paying rent; and (3) "events held in direct support of religious organizations."

The record includes results of applications to waive charges for only one of the preceding years, 1995–96. The funding record shows that requests were made for 26 events, and granted for 23. The ones turned down were the "Casa Car Show," the "Sister Cities Fund Raiser," and the "Fun Day In the Park." Nothing in the record says why any of these were rejected. It may be that the car show was commercial, and that the sister cities and fun day events were sponsored by organizations otherwise funded by the city or using city offices rent-free. We simply do not know. Nor do we know what the city means by its exclusion of funding for "events in direct support of religious organizations" or how the exclusion applies here. The majority believes that the very fact that some applications are denied is enough to decide this case.[1] But this is not enough.

What we do not know matters to the outcome. For that reason, we should vacate the judgment and remand for an evidentiary hearing prior to issuance or denial of a permanent injunction. This record allows for either of two possibilities requiring opposite results. The first possibility is that the city is selective in what events it waives fees for, assuring that the events advance a viewpoint which the city endorses. If so, the city is entitled,[2] and probably required, to deny the waivers for religious events. Or it may be that everyone gets a waiver for these routine municipal expenses except for events that promote religion. If so, that violates the core principal of neutrality required by the First Amendment,[3] and the plaintiffs are entitled to prevail.

The majority opinion says we must "draw lines, sometimes quite fine, based on the particular facts of [this] case" to conclude that "this case involves significant factual differences from *Rosenberger.*"[4] How would we know enough to draw fine lines based on the facts? We do not know the facts. There are no findings of fact. For all we know, the city is entirely unselective in practice. If so, the fund takes on a character similar to that of the quasi-public forum in *Rosenberger.* The government cannot restrict access to a public

1. Maj. Op. at 1079.

2. *See Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569, 586–88, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998).

3. *See Mitchell v. Helms,* 530 U.S. 793, 120 S.Ct. 2530, 2541–42, 147 L.Ed.2d 660 (2000);

*Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 839, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *see also, Rosenberger,* 515 U.S. at 846, 115 S.Ct. 2510 (O'Connor, J. concurring) (summarizing principle of neutrality toward religion).

4. Maj. Op. at 1078.

forum on account of the speaker's religious message.[5] It makes no difference that municipal expenses and personnel are involved in maintaining the space. Government disbursements to organizations supporting a particular sectarian religious viewpoint are required by neutrality rather than barred by the Establishment Clause under *Rosenberger*,[6] and held not to violate the Establishment Clause in *Mitchell v. Helms*.[7] Discriminating against religious institutions by denying them a non-discretionary benefit available to a broad class that otherwise includes them violates the Free Exercise and Equal Protection Clauses.[8] Our Constitution no more permits a government policy of anti-clericalism than favoritism.[9] The Free Exercise Clause is not mere surplusage. Making religious groups pay for what everyone else gets for free is like charging the churches but no one else when they call for police or fire department assistance.[10] Such interference with the free exercise of religion, by imposing a discriminatory burden, would be as plainly unconstitutional as government selection of preferred churches to whose treasuries it would contribute.

If the government makes a public forum available without discriminating against religious speech there could also not be any appearance of endorsement. A non-discretionary government benefit that goes to all non-profits does not violate the Establishment Clause if it includes religious institutions.[11] Neutrality eliminates the potential establishment clause issue.[12] Nor would there be any endorsement inference. The informed observer would know that all non-profits receive the fee waiver and that there is nothing special about the fact that the Gentalas' organization received the waiver. Passersby who see municipal employees at the municipal band shell during the prayer event would no more infer a theological endorsement than they would if they were to see municipal firemen pointing hoses at a church fire.[13]

On the other hand, it may be that the city is selective, routinely denying the waiver to events or groups it feels do not "celebrate and commemorate the historical, cultural and ethnic heritage of the

5. *See Rosenberger*, 515 U.S. at 829–30, 115 S.Ct. 2510.

6. *See id.*

7. *See* 530 U.S. 793, 120 S.Ct. 2530, 2541, 147 L.Ed.2d 660 (2000) ("If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government.").

8. *See id.; see also, Widmar v. Vincent*, 454 U.S. 263, 274–75, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).

9. *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); *Employment Div., Dept. of Human Resources v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Everson v. Bd. of Educ.*, 330 U.S. 1, 18, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

10. *Cf. Roemer v. Board of Pub. Works*, 426 U.S. 736, 747, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976).

11. *See Mitchell*, 120 S.Ct. at 2541; *Rosenberger*, 515 U.S. at 829–30, 115 S.Ct. 2510; *Walz v. Tax Comm'n*, 397 U.S. 664, 672–75, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (finding constitutional statute exempting from taxation real property used exclusively for religious purposes).

12. *See id.*

13. The majority notes that "the Fund supported other events sponsored by religiously-affiliated organizations when the events did not directly benefit the groups themselves, and events with religious themes sponsored by secular organizations" Maj. Op. at 1070 (footnote omitted). How is the passerby or even the "informed observer" to know the fine distinction apparently made (or at least attributed by the majority) between Gentala's request for funding and the city's funding of a fishing clinic sponsored by the Aid Association for Lutherans (not "in direct support") or a depiction of the birth of Christ (not "sponsored by a religious group")?

City" or do not "instill civic pride." If so, the waiver program would not be a public forum at all. Instead, it would be like the grant program in *Finley*—discretionary government funding subject to selective criteria.[14] In that case the city could properly exclude religious organizations from the waiver program, regardless of whether the waivers would violate the Establishment Clause, simply because the religious nature of the events did not promote the city's message of inclusion. And granting a waiver to the Gentalas under these facts would likely violate the Establishment Clause.[15]

Because the record does not enable us to base a decision on the necessary factual predicate, we should vacate and remand for an evidentiary hearing and findings of fact. Therefore I dissent.

---

**14.** *See Finley*, 524 U.S. at 586–88, 118 S.Ct. 2168.

**15.** *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 120 S.Ct. 2266, 2278, 147 L.Ed.2d 295 (2000); *Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384, 395, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *see also, Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 773–74, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring in part and concurring in the judgment) (discussing endorsement inquiry in Establishment Clause cases).