247 F.3d 397 (2nd Cir. 2001)
 JOSEPH M. DESTEFANO, as taxpayer of the County of Orange, State of New York, and of the State of New York, and in his official capacity as Mayor of Middletown, Plaintiff-Appellant,
CITY OF MIDDLETOWN, NEW YORK, Plaintiff,
v.
EMERGENCY HOUSING GROUP, INC., JOSEPH RAMPE, County Executive of the County of Orange, New York, COUNTY OF ORANGE, NEW YORK, JEAN SOMERS MILLER, Commissioner of the New York State Department of Mental Health, BRIAN WING, Commissioner of the New York State Department of Social Services, STATE OF NEW YORK and GLENN S. GOORD, Commissioner of the New York State Department of Correctional Services, Defendants-Appellees.
 Docket No. 99-9146
August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: March 16, 2000
Decided: April 20, 2001
Errata Filed: May 7, 2001
 
 Appeal from a judgment of the United States District Court for the Southern District of New York (Colleen McMahon, Judge) granting summary judgment in favor of the defendants on the plaintiff DeStefano's taxpayer claims brought pursuant to 42 U.S.C. §1983 asserting that the payment of State funds in connection with an Alcoholics Anonymous program violated the Establishment Clause of the First Amendment.
 Vacated and remanded.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 ROBERT N. ISSEKS, Middletown, N.Y., for Plaintiff-Appellant.
 DAVID LAWRENCE III, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, Edward D. Johnson, Deputy Solicitor General, and Mark Gimpel, Assistant Solicitor General, of counsel), New York, N.Y., for Defendants-Appellees.
 Before: McLAUGHLIN, SACK, and KATZMANN, Circuit Judges.
 SACK, Circuit Judge:
 
 
 1
 Plaintiff-Appellant Joseph M. DeStefano, Mayor of Middletown, New York, and a New York State taxpayer, appeals from a judgment of the United States District Court for the Southern District of New York (Colleen McMahon, Judge). DeStefano brought the underlying action pursuant to 42 U.S.C. §1983 claiming that the allocation of New York State tax revenues to a private alcoholic treatment facility that includes Alcoholics Anonymous ("A.A.") in its program violates the Establishment Clause of the First Amendment to the United States Constitution. On cross motions for summary judgment, the district court concluded that the State's provision of funds to the facility did not run afoul of the Establishment Clause and therefore entered summary judgment for the State of New York and the individual administrators of various State agencies (the "State defendants").[1] This appeal followed, requiring us to plunge into the thicket of Establishment Clause jurisprudence. When we emerge, we vacate the judgment of the district court.
 
 
 2
 We conclude principally that the State's funding of the treatment facility does not violate the Establishment Clause despite the facility's inclusion in its program of A.A. sessions which this Court has previously held to be religious in nature if, among other things, the facility's staff neither coerces clients to attend such sessions nor itself indoctrinates clients in A.A. principles. DeStefano concedes the absence of coercion. We therefore remand the case to the district court for it to determine whether, as a matter of fact, the staff of the facility inculcates clients in A.A. doctrine.
 
 BACKGROUND
 MACC Mission, Activities, and Funding
 
 3
 Defendant-Appellee Emergency Housing Group, Inc.[2] operates four different programs: a shelter for homeless adults and families, a shelter for runaway youth, a homelessness prevention program, and the Middletown Alcohol Crisis Center (the "MACC"). The MACC, at the heart of this controversy, is a non-medical, short-term alcohol detoxification and treatment facility licensed by the State of New York and located in the City of Middletown, Orange County, New York. It is housed in Wallach Hall, a State-owned building, for which the MACC pays rent to the State.
 
 
 4
 During 1996, the year in which this lawsuit was begun, the MACC treated approximately 700 people, each of whom spent at least one night at Wallach Hall. Typically, the MACC's clients are intoxicated when they arrive at the facility, but those who are not and are simply seeking a safe and sober environment may also take part in the MACC's program. A client who is looking "just for detox" and then wishes to return to his or her prior life ordinarily resides at the MACC for three to five days. For those who want to "go on to the next level of care," the stay may be extended for approximately two weeks. All MACC clients are at the facility of their own volition and can leave at any time. State employees or agencies do not "place" persons needing substance-abuse treatment at the MACC.
 
 
 5
 The MACC aims to provide its clients with a wide variety of services, including, according to its literature, "supervision during the [client's] sobering-up phase, alcoholism counseling, rap groups, educational films, participation in [A.A.], recreational activities, meals, assessments and referrals for continuing treatment." Although it is undisputed that A.A. and its Twelve Step program[3] play a central role in the MACC's overall treatment approach, the precise nature of this role is in dispute. A.A. meetings, which are open to the public, are held in Wallach Hall, and although clients are not required to attend, the MACC staff at least "strongly suggest[s]" that they do. These meetings are listed as part of the MACC's daily schedule, which is posted in the facility's common areas. The MACC's "day room," also located in Wallach Hall, is accessible twenty-four hours a day and offers A.A. literature, including The Big Book, Daily Reflections, and pamphlets discussing the Twelve Steps, as well as videotapes with similar content. All of this promotional material is placed in Wallach Hall by A.A. representatives. DeStefano contends that MACC staff members discuss this literature during ordinary, non-A.A. meetings at Wallach Hall and show the A.A. videotapes for client audiences three times a week; the defendants challenge both of these assertions. DeStefano further alleges that MACC staff members supervise A.A. meetings, a contention that the defendants also deny.
 
 
 6
 The MACC receives approximately ninety-five percent of its annual funding -- roughly one-half million dollars -- from the State of New York.[4] Because such a high percentage of the program's budget comes from the State, most of the rent for Wallach Hall and the greater part of staff salaries are necessarily paid with State funds. These subsidies originate with the New York State Office of Alcoholism and Substance Abuse Services ("OASAS"), an agency charged with the task of developing, promoting, and awarding grants to alcohol abuse and treatment programs offered by community and private organizations. See N.Y. Mental Hyg. L. §19.07, §19.09(e)(1), §19.15 (McKinney 1996). The Mid-Hudson Region of OASAS, comprising Suffolk, Westchester, Rockland, Ulster, Putnam, and Orange counties, allocates about $25 million annually for alcohol and substance abuse treatment and prevention, most of which is distributed first to the individual counties and ultimately to local programs such as the MACC.
 
 
 7
 In order to receive New York State funding, an alcohol treatment program must be licensed by the State through OASAS. See id. §19.07(d)(1), (e). The MACC receives its license by submitting to OASAS a "Policies and Procedures Manual," which is reviewed and approved by the agency approximately once every eighteen months. The MACC's manual is pervaded by references to A.A. and to the integral role of the Twelve Step program in the achievement of the organization's goals. A version that was approved by the State in May 1996 represents that among the MACC's services are "in house group [A.A.] meeting[s] two times per week, and four outside meetings on the MACC grounds which are strongly suggested for clients that are physically able to attend." MACC staff working the afternoon shift, the manual further explains, are to "[s]upervise [an] AA/NA [me]eting on or off unit."[5] Part of the manual's "Prescription for Recovery" includes "[m]embership in an AA/NA group -- preferably one that is STEP orientated"; "[s]election of a sponsor who has taken the 12 Steps and put them into his/her life"; "total commitment and involvement in an AA/NA group"; and "[e]ncourage[ment of attendance by] family or [a] significant other [at] an open AA/NA meeting." Finally, the manual explains that during "Evening Meditation & Wrap-up" sessions conducted nightly, the MACC staff reads and discusses "passages from scripture" and excerpts from various books, including a statement of A.A. principles and beliefs called 12 Steps and 12 Traditions. The manual is the only document submitted by the MACC and reviewed by the OASAS for purposes of the approval necessary for State funding.
 
 Proceedings in the District Court
 
 8
 DeStefano, acting as an individual New York State taxpayer and not as the Mayor of Middletown, filed his complaint on December 4, 1996 in the United States District Court for the Southern District of New York, alleging that the State's act of approving funding for the MACC and the manner in which such funds are in fact expended by the program violate the First Amendment's Establishment Clause.[6] Following almost a year of discovery, the district court concluded that the only issue of fact for which a trial was necessary was whether MACC staff members explicitly or implicitly coerce clients to take part in A.A. activities. On the first day of trial, however, DeStefano withdrew his allegations of coercion, and the district court therefore ruled on the parties' cross motions for judgment as a matter of law.
 
 
 9
 In an opinion issued on September 10, 1999, the district court held that DeStefano had standing as a taxpayer to bring the Establishment Clause challenge, but that the defendants were entitled to summary judgment on the merits of that claim. See DeStefano v. Miller, 67 F. Supp. 2d at 274, 276 (S.D.N.Y. 1999). The court construed case law from the Supreme Court, this Circuit, and the New York Court of Appeals to imply that the State may fund private entities that offer A.A. services as long as recipients do not coerce people to attend. Because DeStefano had in effect conceded that there was no coerced participation in A.A. activities at the MACC, the court held, he had failed to demonstrate an Establishment Clause violation. See id. at 285-88.
 
 
 10
 DeStefano timely appealed the district court's judgment, challenging both the entry of summary judgment for the defendants and the denial of his corresponding cross motion.
 
 DISCUSSION
 I. Standard of Review and Standing
 
 11
 We review the district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the non moving party. See Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), cert. denied, 529 U.S. 1098 (2000). Summary judgment is appropriate where "there is no genuine issue as to any material fact and... the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue of fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.
 
 
 12
 As the district court concluded, see DeStefano, 67 F. Supp. 2d at 280-84, and the parties do not dispute, DeStefano has standing as a State taxpayer to bring this suit. By challenging the constitutionality under the Establishment Clause of an expenditure made "pursuant to... statutory mandate," Lamont v. Woods, 948 F.2d 825, 830 (2d Cir. 1991), DeStefano has established "a logical link between [his status as a taxpayer] and the type of legislative enactment attacked" as well as "a nexus between that status and the precise nature of the constitutional infringement alleged." Flast v. Cohen, 392 U.S. 83, 102 (1968); see Board of Educ. of Kiryas Joel Sch. Dist. v. Grumet, 512 U.S. 687, 694 (1994) (assuming the existence of standing in a suit brought by New York State taxpayers challenging state statute). The basis of DeStefano's standing foreshadows the limits of his claim: to require New York to cease funding the MACC's A.A.-related activities.
 
 II. Legal Framework and Background
 A. Applicable Law
 
 13
 DeStefano asserts violations of the Establishment Clause of the First Amendment to the United States Constitution, which applies to the states through the Due Process Clause of the Fourteenth Amendment. See County of Allegheny v. ACLU, 492 U.S. 573, 588 (1989); Everson v. Board of Educ., 330 U.S. 1, 8 (1947). The Establishment Clause provides simply that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. Although the Supreme Court has struggled for more than a century to translate those spare terms into concrete rules and consistent doctrine, the Court has found itself "compel[led]" by "candor" to "acknowledge[] that [it] can only dimly perceive the boundaries of permissible government activity in this sensitive area." Mitchell v. Helms, 120 S. Ct. 2530, 2540 (2000) (plurality opinion) (quoting Tilton v. Richardson, 403 U.S. 672, 678 (1971) (plurality opinion)). In the wake of a number of fragmented Court decisions over the past decade, the governing law remains in doubt. See, e.g., Mitchell v. Helms, supra (yielding three opinions that disagreed on the appropriate framework for assessing Establishment Clause claims); Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 395 n.7 (1993) (noting the continuing force of traditional doctrine); id. at 398-400 (Scalia, J., concurring) (criticizing the prevailing standard and suggesting that a majority of the Court would overrule it).
 
 
 14
 We continue in this Circuit to apply the general test first set forth by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602 (1971), as modified by Agostini v. Felton, 521 U.S. 203, 232 (1997). See Altman v. Bedford Cent. Sch. Dist., No. 99-7969(L), 245 F.3d 49, 75, (2dCir. 2001); Marchi v. Board of Coop. Educ. Servs. of Albany, 173 F.3d 469, 475 (2d Cir. 1999); see also Simmons-Harris v. Zelman, 234 F.3d 945, 952 (6th Cir. 2000) ("The Supreme Court has not overturned or rescinded the Lemon test.").
 
 
 15
 As originally formulated, the Lemon test required that "a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion." County of Allegheny v. American Civil Liberties Union, Pittsburgh Chapter, 492 U.S. 573, 592 (1989) (citing Lemon, 403 U.S. at 612-13); see also Agostini, 521 U.S. at 218. Agostini enhanced the second part of this test -- the so-called "effects prong," Wallace v. Jaffree, 472 U.S. 38, 66 n.9 (1985) (Powell, J., concurring) (internal quotation marks omitted) -- by fusing within it the inquiry into excessive entanglement, which had theretofore been the separate third part of the test. See Mitchell, 120 S.Ct. at 2559 (O'Connor, J., concurring in the judgment); id. at 2540 (plurality opinion).
 
 
 16
 Thus, when presented with Establishment Clause challenges, we are required to ask "'whether the government acted with the purpose of advancing or inhibiting religion' and 'whether the aid has the effect of advancing or inhibiting religion.'" Mitchell, 120 S.Ct. at 2559 (O'Connor, J., concurring in the judgment) (quoting Agostini, 521 U.S. at 222-23); Marchi, 173 F.3d at 475-76. We employ "three primary criteria" to answer the latter question: whether the action or program "result[s] in governmental indoctrination; define[s] its recipients by reference to religion; or create[s] an excessive entanglement." Agostini, 521 U.S. at 234. These same factors can in most situations be evaluated to answer what is often thought to be a separate question, whether a practice amounts to an unconstitutional government "endorsement" of religion. Id. at 235; Mitchell, 120 S.Ct. at 2560 (O'Connor, J., concurring in the judgment).
 
 B. The Decision Below
 
 17
 The district court relied heavily on our decision in Warner v. Orange County Dep't of Probation, 115 F.3d 1068 (2d Cir. 1997), reaff'd after remand, 173 F.3d 120 (2d Cir.), cert. denied, 528 U.S. 1003 (1999), in which we held that a county government agency violated the Establishment Clause when it conditioned the plaintiff's criminal probation on his participation in A.A. See id. at 1075-76. We concluded that the A.A. program to which the plaintiff in Warner was subjected constituted religious activity for Establishment Clause purposes because it
 
 
 18
 had a substantial religious component. Participants were told to pray to God for help in overcoming their affliction. Meetings opened and closed with group prayer. The trial judge reasonably found that it "placed a heavy emphasis on spirituality and prayer, in both conception and in practice." We have no doubt that the meetings [the plaintiff] attended were intensely religious events.
 
 
 19
 Id. at 1075 (footnote omitted). The insistence by county probation officers that a court require the plaintiff, who was on probation for drunk driving convictions, to attend the A.A. sessions as part of his sentence was therefore a violation of the Establishment Clause. As in Lee v. Weisman, 505 U.S. 577 (1992), which held that clergy-led prayer at a public-high-school graduation violated the Establishment Clause, our ruling in Warner depended "on the 'fundamental limitation[] imposed by the Establishment Clause' that bars government from 'coerc[ing] anyone to support or participate in religion or its exercise.'" Warner, 115 F.3d at 1075 (quoting Lee, 505 U.S. at 587) (alterations in original). We further explained that "[h]ad [the plaintiff probationer] been offered a reasonable choice of therapy providers, so that he was not compelled by the state's judicial power to enter a religious program, the considerations would be altogether different." Id.
 
 
 20
 The district court in the case before us rightly considered the A.A. program at the MACC to be a "religion" for Establishment Clause purposes. It is too late in the day for the defendants to argue otherwise. SeeWarner; Griffin v. Coughlin, 88 N.Y.2d 674, 683, 649 N.Y.S.2d 903, 908, 673 N.E.2d 98 (1996), cert. denied, 519 U.S. 1054 (1997) (holding that a review of A.A. materials "demonstrates beyond peradventure that doctrinally and as actually practiced in the 12 step methodology, adherence to the A.A. fellowship entails engagement in religious activity and religious proselytization"); see also Kerr v. Farrey, 95 F.3d 472, 479-480 (7th Cir. 1996) (reaching the same conclusion about a materially indistinguishable N.A. program); Alexander v. Schenk, 118 F. Supp. 2d 298, 300 n.1 (N.D.N.Y. 2000) (treating A.A. as a religion, following Warner and Griffin); Yates v. Cunningham, 70 F. Supp. 2d 47, 49 (D.N.H. 1999) (same, citing, inter alia, Warner and Kerr); Warburton v. Underwood, 2 F. Supp. 2d 306, 316-18 (W.D.N.Y. 1998) (treating N.A. as a religion, citing, inter alia, Warner and Griffin).
 
 
 21
 We find no basis on which to distinguish the content of the A.A. program at the MACC from that which was before us in Warner. Both programs use the same Twelve Step system in which participants pledge, among other things, to "turn [their] will and [their] lives over to the care of God as [they] understood him"; both programs distribute standard A.A. literature reflecting the need to take these and similarly religious "steps"; and both conduct meetings in which these beliefs are inculcated. See DeStefano, 67 F. Supp. 2d at 278; Warner v. Orange County Dep't of Probation, 870 F. Supp. 69, 70-71 (S.D.N.Y. 1994), remanded, 115 F.3d 1068 (2d Cir. 1997), reaff'd after remand, 173 F.3d 120 (2d Cir.), cert. denied, 120 S.Ct. 495 (1999).
 
 
 22
 But the district court apparently read Warner to imply that because the presence of coercion in that case was sufficient to invalidate the requirement of attendance at A.A. meetings, see 115 F.3d at 1076 n.8, the conceded absence of coercion in this case was conversely sufficient to uphold the disputed aspects of A.A. involvement in the MACC program. As the district court said at a pretrial hearing, "[M]y reading of the cases is that there's nothing wrong with having [A.A.]... in facilities that receive State funds, as long as people aren't compelled to attend." In that, the court was mistaken. Although the presence or absence of this type of compulsion is an important part of the analysis, the Establishment Clause prohibits the expenditure of funds to aid in the establishment of religion even if the only coercion involved is in the collection of taxes to be used for that purpose. See Flast, 392 U.S. at 103 ("Our history vividly illustrates that one of the specific evils feared by those who drafted the Establishment Clause and fought for its adoption was that the taxing and spending power would be used to favor one religion over another or to support religion in general.").
 
 III. Analysis
 
 23
 Our conclusions that the A.A. program is religious activity under our case law and that the district court's decision was incomplete require us to assess the merits of DeStefano's assertions under the First Amendment. We understand him to advance three such arguments. The first, which we address in Part III.A, below, is based on the way in which State funds are actually expended at the MACC. The second, which we analyze in Part III.B, centers on the MACC's use of Wallach Hall for A.A. meetings and as a library of A.A. promotional material intended for MACC clients. The third, which is the subject of Part III.C, challenges the State's act of approving the MACC for funding irrespective of the activities that actually occur there.
 
 A. Actions by State-Funded MACC Employees
 
 24
 DeStefano first argues that the expenditure of State money to fund the various activities of MACC staff members violates the Establishment Clause. We divide the alleged conduct of the MACC staff to which DeStefano objects into three general groups: the first consists of the inclusion of A.A. in the MACC program through the MACC's employment of a treatment approach in which independently led A.A. meetings play a substantial role; the second focuses on the MACC staff's urging or encouragement of client participation in A.A. events; and the third consists of the MACC staff's alleged direct participation in the inculcation of A.A. views through nightly readings of the group's literature, discussion of A.A. tenets at MACC events, supervision of A.A. meetings, and screenings for client audiences of videotapes that focus on the Twelve Steps.
 
 
 25
 The question with respect to all three groups of activities is whether the State may finance such conduct without running afoul of the Establishment Clause; the answer, we conclude, is that the State may fund the first and second set of activities but not the third. Because we are unable to determine on the current record precisely what activities actually take place at the MACC, we remand for the district court to resolve several factual disputes that may ultimately prove dispositive of DeStefano's challenge to State funding of the third group of activities.
 
 
 26
 1. Inclusion of A.A. in the MACC Program.
 
 
 27
 We conclude that DeStefano's challenge to State funding of the MACC based on the mere inclusion of A.A. as one element in the program's treatment plan is foreclosed by the Supreme Court's decision in Bowen v. Kendrick, 487 U.S. 589 (1988). There, the Court considered an Establishment Clause challenge to the federal Adolescent Family Life Act ("AFLA"), in which Congress sought to address the "'multiple and complex'" problems of adolescent premarital sexual relations by expressly enlisting the aid of religious and charitable organizations in the provision of federally funded services. Bowen, 487 U.S. at 595 (quoting 42 U.S.C. §300z(a)(8)(A)). The AFLA not only stated that grant recipients in this area should "emphasize the provision of support by other family members, religious and charitable organizations," but indeed affirmatively required that applicants for AFLA funds explain how they would engage "families of adolescents[, and] involve religious and charitable organizations, voluntary associations, and other groups in the private sector as well as services provided by publicly sponsored initiatives." Id. at 596 (quoting 42 U.S.C. §300z(a)(10)(C), §300z-5(a)(21)) (alteration in original). It was undisputed in Bowen "that a number of grantees or subgrantees were organizations with institutional ties to religious denominations." Id. at 597.
 
 
 28
 The plaintiffs in Bowen mounted both a facial and an as-applied attack on the AFLA. The Court began by addressing the first challenge, holding that the Lemon factors did not require invalidation of the AFLA on its face. Id. at 617-18. First, the Court concluded that "it is clear from the face of the statute that the AFLA was motivated primarily, if not entirely, by a legitimate secular purpose." Id. at 602. The Court next turned to what it deemed "the more difficult question," holding that the law did not have the primary effect of advancing religion but rather struck a successful balance "of neutrality among religions, and between religion and non-religion" because "a fairly wide spectrum of organizations is eligible to apply for and receive funding under the Act." Id. at 607-08 (internal quotation marks omitted). Finally, the Court decided that because the AFLA recipients were apparently not "pervasively sectarian," there was no need for intensive monitoring of the use of federal funds and therefore no basis for a finding of "excessive entanglement." Id. at 616-17.
 
 
 29
 DeStefano does not advance a facial challenge either to New York's expenditure of funds on alcohol treatment programs or to the statute pursuant to which those expenditures are made. Instead, his challenge is aimed at State financing of the MACC's inclusion in its program of meetings that are led by A.A. representatives. He argues that such funding is constitutionally impermissible because it endorses a religious approach to the problem of alcoholism and thereby forges a symbolic link between the State of New York and A.A. Relevant for present purposes, then, is the Bowen Court's treatment of the plaintiff's argument in that case that "the statute is invalid under the Establishment Clause because... it expressly enlists the involvement of religiously affiliated organizations in the federally subsidized programs, it endorses religious solutions to the problems addressed by the Act, [and thereby] creates symbolic ties between church and state." Id. at 606. The Court not only rejected this argument with respect to AFLA, but also explained that such a symbolic union is not necessarily created even where the government funds religious organizations directly:
 
 
 30
 If we were to adopt [the plaintiff's] reasoning, it could be argued that any time a government aid program provides funding to religious organizations in an area in which the organization also has an interest, an impermissible "symbolic link" could be created, no matter whether the aid was... used solely for secular purposes. This would jeopardize government aid to religiously affiliated hospitals, for example, on the ground that patients would perceive a "symbolic link" between the hospital -- part of whose "religious mission" might be to save lives -- and whatever government entity is subsidizing the purely secular medical services provided to the patient.
 
 
 31
 Id. at 613.
 
 
 32
 For two reasons, the Supreme Court's reasoning in Bowen requires us to reject DeStefano's argument that State funding of the MACC's inclusion of A.A. in its treatment approach sends a signal of union between government and religion. First, the MACC is not itself a religious organization, and there is thus no sectarian grantee here. Rather, DeStefano is challenging the link created by the funding of a secular organization, the MACC, that uses a religious group for the achievement of some of its secular goals. Second, unlike the AFLA grantees, the MACC is not required to (although it does) describe to the State how it will integrate religious organizations into its efforts to treat alcoholism. If, as the Court held in Bowen, the federal government may require grantees to enlist religious groups among others in order to receive public funding and may also provide grants directly to religious organizations whose beliefs coincide with Congress's secular goals, id. at 606, then surely New York State may allow a publicly funded secular organization to carve out a role for a religious group in a treatment approach that includes a number of nonreligious elements. In other words, if the emphasis on "the provision of support by... religious and charitable organizations" by AFLA grantees, 42 U.S.C. §300z(a)(10)(C), was deemed only "incidental[ly] and remote[ly]," and therefore permissibly, to advance religion in Bowen, 487 U.S. at 607, we do not see how the expenditure of State funds can be impermissible in this case to the extent that the MACC relies on A.A., which for these purposes is a religious organization, as part of its secular program. We therefore hold that the MACC's involvement of A.A. in its State-funded treatment approach is not in itself constitutionally impermissible. Funding of such conduct represents nothing more -- indeed, substantially less -- than what was contemplated by the AFLA and upheld by the Supreme Court in the facial portion of Bowen.
 
 
 33
 2. MACC Encouragement of Client Participation in A.A.
 
 
 34
 The MACC staff's "strong[] urg[ing]" and "active[] encourage[ment]" of client participation in A.A. presents a closer question. DeStefano, 67 F. Supp. 2d at 278 n.4, 279. We conclude, however, that under the circumstances of this case and in light of concessions made by DeStefano in the district court, State funding of those activities does not violate the Establishment Clause.
 
 
 35
 a. The Endorsement Test
 
 
 36
 DeStefano vigorously argues that public funding of the salaries of MACC staff members who encourage and urge clients to attend A.A. sessions amounts to government promotion of or favoritism toward "the A.A. religion" in contravention of the Establishment Clause. In support of this contention, DeStefano relies principally on the few cases in which the Supreme Court has suggested or held that the government acts unconstitutionally when it sends a message of "endorsement" of one religion over another, or of religion in general. See, e.g., Lee, 505 U.S. at 604 (Blackmun, J., concurring) ("Government pressure to participate in a religious activity is an obvious indication that the government is endorsing or promoting religion."); County of Allegheny, 492 U.S. at 592-93; Lynch, 465 U.S. at 681; Wallace v. Jaffree, 472 U.S. 38, 70 (1985) (O'Connor, J., concurring in the judgment) (urging that the Establishment Clause "preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred").
 
 
 37
 We must reject DeStefano's reliance on this line of cases. In recent Supreme Court decisions, the "endorsement" inquiry has been subsumed under the Lemon-Agostini framework such that analysis of the criteria for determining a practice's primary effect also resolves any endorsement challenge. Mitchell, 120 S.Ct. at 2555 (plurality opinion); id. at 2560 (O'Connor, J., concurring in the judgment); Agostini, 521 U.S. at 235. We read these decisions as casting doubt on the vitality of the endorsement test as a stand-alone measure of constitutionality in most Establishment Clause cases, and we decline to invalidate New York State's funding of the MACC on that basis in the absence of support from the more specific factors set forth in Agostini. To be sure, the endorsement inquiry remains a viable test of constitutionality in certain unique and discrete circumstances -- for example, where the government embraces a religious symbol or allows the prominent display of religious imagery on public property, see County of Allegheny, 492 U.S. at 595; Lynch, 465 U.S. at 688-94 (O'Connor, J., concurring) -- but the case before us does not fall within any such narrow category.
 
 
 38
 We decide in subpart III.A.2.d, below, that State funding of the MACC's encouragement and urging of clients to attend A.A. sessions does not have the primary effect of advancing religion under the analysis we are required to perform. "The same considerations that justify this holding require us to conclude that [such conduct] also cannot reasonably be viewed as an endorsement of religion." Agostini, 521 U.S. at 235.
 
 
 39
 b. Bowen
 
 
 40
 Nor do we think that Bowen resolves DeStefano's challenge to State funding of the MACC staff's practice of encouraging client participation in A.A. activities. Because of Bowen's posture, the Court addressed only the outer limits of permissible and impermissible conduct under the Establishment Clause. At one extreme, in addressing the facial challenge to AFLA, the Court upheld the involvement of religious organizations in the provision of federally funded services. See Bowen, 487 U.S. at 617-18. At the other end of the spectrum, in the as-applied discussion, the Court suggested that it would be unconstitutional for federal aid recipients to participate in "specifically religious activities" or "to use materials that have an explicitly religious content or are designed to inculcate the views of a particular religious faith." Id. at 621. But Bowen did not address the great many activities falling between the mere "involvement" of religious groups in state-sponsored programs on the one hand and the direct public financing of purely sectarian activity using religious material on the other. We think that State funding of a clinic that encourages people to engage in religious activities falls within this zone of questionable and unresolved conduct.
 
 
 41
 c. Coercion
 
 
 42
 Although we do not decide the issue of coercion because it has not been squarely presented to us, understanding our resolution of this appeal and the discussion that follows requires a recognition that at the heart of Establishment Clause doctrine lies the principle that "government may not coerce anyone to support or participate in religion or its exercise." Warner, 115 F.3d at 1074 (citing Lee v. Weisman, 505 U.S. 577, 587 (1992) (internal quotation marks omitted)).[7] It follows from this prohibition that when state funds are used to coerce worship or prayer,[8] the Establishment Clause has been violated. See Rutan v. Republican Party of Ill., 497 U.S. 62, 77-78 (1990) ("What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly.").
 
 
 43
 The Supreme Court has made clear that the type of coercion that violates the Establishment Clause need not involve either the forcible subjection of a person to religious exercises or the conditioning of relief from punishment on attendance at church services. See Lee, 505 U.S. at 586-99; Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 311-13 (2000). Coercion is also impermissible when it takes the form of "subtle coercive pressure" that interferes with an individual's "real choice" about whether to participate in worship or prayer. Lee, 505 U.S. at 592, 595. Government and those funded by government "may no more use social pressure to enforce orthodoxy than [they] may use more direct means." Lee, 505 U.S. at 594; Santa Fe Indep. Sch. Dist., 530 U.S. at 312.
 
 
 44
 The fulcrum of this inquiry, we think, is individual conscience and free will. In the circumstances of this case, only if a MACC client attends A.A. sessions as a matter of his or her own genuine personal choice has he or she not been coerced.
 
 
 45
 DeStefano presented substantial evidence to the district court that the State may in fact be funding a more coercive form of speech and conduct than the encouragement or "strong[] suggest[ion]" referred to in the MACC's literature. Barbara Gelblatt, the MACC's Program Director, testified that all clients are "for the most part... required to follow the MACC's schedule," which includes at least one A.A. meeting each day and offers no secular alternative. The MACC staff's "encouragement" is apparently so effective that Gelblatt could not remember a single instance in five years at the MACC in which a client refused to attend A.A. meetings. And she stated that in the event of such a refusal, MACC staff members would "process" the reasons for a client's "resistance." This was corroborated by two affidavits of former MACC clients who attested that they had been required to attend A.A. meetings while residing at the MACC. Finally, the intoxicated and distressed state of most new entrants to the program might raise an inference that MACC clients are unduly susceptible to persuasion by MACC employees.
 
 
 46
 We have no reason to question the district court's finding that "the MACC clients have ultimate control over their own presence at the facility, and, hence, whether they are exposed to the religious activities of A.A." See DeStefano, 67 F. Supp. 2d at 287-88. But we doubt that the fact that clients were not forced to seek care or treatment at the MACC in the first place establishes that their subsequent attendance at A.A. meetings was necessarily a matter of free choice.
 
 
 47
 Our doubts in this regard are fueled by Supreme Court decisions holding that clergy- or student-led prayer at public-high-school graduations and football games is impermissibly coercive despite the fact that students ostensibly have a choice as to whether to attend such activities. See Santa Fe Indep. Sch. Dist., 530 U.S. at 311-13; Lee, 505 U.S. at 594-95. Noting that "[t]he law reaches past formalism," the Court concluded in each situation that although "[a]ttendance may not be required by official decree,... it is apparent that a student is not free to absent herself from the... exercise in any real sense of the term 'voluntary,' for absence would require forfeiture of those intangible benefits" that accompany one's high school experience. Lee, 505 U.S. at 595; see also Santa Fe Indep. Sch. Dist., 530 U.S. at 311-12. The Court's reasoning seems to apply with even greater force to the case before us. The "choice" between forgoing the alcohol treatment provided by the State and coping with one's alcoholism without professional assistance or with assistance at substantial personal expense or inconvenience, on the one hand, and availing oneself of that treatment and thereby "facing a personally offensive religious ritual," on the other, may be no choice at all. Id. at 312. "It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice." Lee, 505 U.S. at 596. If an afflicted individual has "no real [state-sponsored] alternative" to the services offered by the MACC, id. at 598, the theoretical choice to avoid the facility does not mitigate any coercion that might occur there.
 
 
 48
 The evidence of coercion presented by DeStefano was substantial enough for the District Court to conclude that there was a triable issue of fact as to whether the MACC's staff coerced its clients to attend A.A. sessions. Whether the MACC clients participated in the A.A. program of their own free will was thus in doubt. But on the very day the court was prepared to begin trial on that issue, DeStefano withdrew his allegations of coercion without explanation. Because he specifically disavowed any assertion of coercion before the district court, we are not called upon to decide whether, if the MACC were to exert even'subtle coercive pressure' on its clients to attend A.A. events so that participation in the religious exercises were not 'in any real sense of the term 'voluntary,'" Id. at 592, 595, State funding of the MACC would then be unconstitutional.
 
 
 49
 d. The Lemon-Agostini Test
 
 
 50
 Because none of the foregoing -- the endorsement test, the principles drawn from Bowen, or the presence or absence of coercion -- determines whether State funding of the MACC's encouragement of client attendance at A.A. meetings impermissibly advances A.A.'s religious activity, we must apply the Lemon-Agostini test to decide that issue.
 
 
 51
 DeStefano does not dispute that the State's purpose in financing MACC activities is secular. There can be little doubt that New York State is spending money principally to fight alcohol abuse, not to promote religion. The first part of the Lemon-Agostini test is therefore not at issue.
 
 
 52
 The remaining question, then, is "whether the aid has the 'effect' of advancing or inhibiting religion." Agostini, 521 U.S. at 223); see also Lemon, 403 U.S. at 612 (holding that a practice's "principal or primary effect must be one that neither advances nor inhibits religion"). The Supreme Court has instructed us to employ "three primary criteria" to decide the "effects" issue: whether the action "result[s] in governmental indoctrination; define[s] its recipients by reference to religion; or create[s] an excessive entanglement" between religion and the state. Agostini, 521 U.S. at 234. We address the criteria in reverse order.
 
 
 53
 We are given no reason to conclude, and DeStefano does not argue, that New York State has or will become excessively entangled in religion by funding the MACC. It is true that when the constitutionality of state funding is measured by how taxpayer money is used by a recipient, the State must keep an eye on the activities that are supported by that funding. This alone is not necessarily excessive entanglement. In MACC's case, the State's oversight need not amount to more entanglement -- and it may amount to less -- than the kind that the Agostini Court addressed and deemed constitutionally unobjectionable: unannounced monthly visits by public supervisors to entities receiving government assistance. See Agostini, 521 U.S. at 234 ("[W]e have not found excessive entanglement in cases in which States imposed far more onerous burdens on religious institutions than the monitoring system at issue here.") (citing Bowen, 487 U.S. at 615-17 (finding no excessive entanglement where the state reviewed the programs conceived and materials used by religious grantees of federal aid and monitored the recipients' activities through periodic visits)).
 
 
 54
 Nor could DeStefano plausibly contend that New York State "define[s] its [aid] recipients by reference to religion." Id. Nothing in the record before us suggests that OASAS distributes state funds in a discriminatory manner favoring religious approaches in general or A.A. in particular.
 
 
 55
 Because DeStefano has thus failed to meet the second or third Lemon-Agostini "effects" criteria, we turn to the first: whether the contested action "result[s] in governmental indoctrination." Agostini, 521 U.S. at 223. To satisfy that criterion, DeStefano must show (1) that public funding of the MACC's encouragement of A.A. participation constitutes or results in indoctrination, and (2) that such indoctrination is attributable to the government. See id. at 226 (stating that the question of governmental indoctrination hinges on whether indoctrination could "'be attributed to state decisionmaking'") (quoting Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 10 (1993)) (emphasis in Agostini); Mitchell, 120 S.Ct. at 2568 (O'Connor, J., concurring in the judgment) (noting that the issue is whether "any indoctrination taking place" is "directly attributable to the government").
 
 
 56
 To "indoctrinate" means "[t]o instruct in a body of doctrine or principles.... To imbue with a partisan or ideological point of view...." The American Heritage Dictionary of the English Language 894 (4th ed. 2000). The Supreme Court uses "indoctrination" synonymously with "inculcation." See, e.g., Mitchell, 120 S.Ct. at 2567 (O'Connor, J., concurring in the judgment); Agostini, 521 U.S. at 223, 224; Bowen, 487 U.S. at 621; Lemon, 403 U.S. at 619. To "inculcate" is "[t]o impress (something) upon the mind of another by frequent instruction or repetition; [to] instill." American Heritage Dictionary at 889 (also using "indoctrinate" as a synonym for "inculcate").
 
 
 57
 Employing these definitions, it is clear that the MACC staff members -- the only people in receipt of state funds -- are not "indoctrinating" when they encourage clients to attend A.A. meetings. Urging people to attend or explaining to them why, in the view of the speaker, it is in their best interests to attend A.A. sessions is not, without more, indoctrination. It does not imbue clients with A.A.'s point of view, nor does it inculcate or "impress [A.A. beliefs] upon the mind of the listener by frequent instruction or repetition." Id. at 889.
 
 
 58
 It is equally clear, however, that state funding of the MACC staff members' encouragement results in indoctrination whenever those staff members succeed in urging their clients to participate in the A.A. program.[9] The question under the Establishment Clause cases, however, is whether State funding of the MACC's encouragement results in governmental indoctrination -- that is, indoctrination attributable to the government -- contrary to the first Agostini "effects" criterion.
 
 
 59
 Not every government action that results in indoctrination results in "governmental" indoctrination. To hold otherwise would be to render superfluous the word "governmental" in this central and presumably carefully worded Lemon Agostini factor. Such a holding would also sweep too broadly. Many governmental acts plainly within the pale result in some indoctrination. There can be little doubt, for instance, that the federal law designating Christmas Day as a legal holiday results in the indoctrination of those for whom December 25 is therefore given over in part from work to religious instruction. So does the common practice of leasing rooms in state-owned and operated airports to religious groups likely result in the inculcation of passing travelers in religious tenets. See Hawley v. City of Cleveland, 24 F.3d 814, 822 (6th Cir. 1994). We doubt that either of these activities results in "governmental" indoctrination within the meaning of the Lemon-Agostini test.
 
 
 60
 A view of Agostini under which government action need only result in indoctrination to be unconstitutional would also conflict with the many Establishment Clause cases in which the Supreme Court has upheld government activity despite the fact that it plainly did result in indoctrination. See, e.g. Rosenberger v. Rector Bd. of Visitors of the Univ. of Virginia, 515 U.S. 819 (1995) (holding that a state may reimburse a religious student group for costs incurred in printing an indoctrinating publication); Zobrest v. Catalina Foothills School Dist., 509 U.S. 1 (1993) (holding that the Establishment Clause permits the state to provide a sign language translator for a deaf student in a parochial school in order to allow her to be indoctrinated); Witters v. Washington Dept. of Servs. for Blind, 474 U.S. 481 (1986) (holding permissible state funding of a visually impaired student's rehabilitative assistance that was used for tuition at a religious school); Mueller v. Allen, 463 U.S. 388 (1983) (sustaining a state statute allowing parents to deduct the costs of tuition, textbooks, and transportation even though the statute would result in children undergoing indoctrination at parochial schools); Everson, 330 U.S. at 16-18 (approving state funding of children's transportation to parochial schools although the effect was to expose some children who would not otherwise have attended those schools to religious indoctrination). We read the holdings of these cases and the language of Agostini itself to require that there be some nexus between the disputed government action and the resulting indoctrination, beyond the bare existence of a causal relationship between the two, before we can properly attribute the indoctrination to "state decisionmaking" and thereby declare it to be "governmental."
 
 
 61
 In the case before us, there is an insufficient basis on which to attribute the inculcation conducted by private A.A. representatives to the State of New York. A.A. itselfdoes not receive State funding either directly through OASAS or derivatively through the MACC. Nor is the MACC merely a secular front for or alter ego of A.A.'s religious mission: Because the MACC program, according to its literature, boasts a variety of components unrelated to A.A., such as supervision, counseling, rap sessions, assessments, referrals, and recreational activities, there is no reason to conclude that the sole purpose or primary effect of State funding of the MACC is to funnel clients into A.A.'s religious activities. Finally, DeStefano abandoned in the district court his contention that MACC clients are coerced into attending A.A. sessions. We conclude that in the absence of any such assertion or circumstance, the indoctrination of MACC clients by private A.A. representatives, although resulting in part from State funding of the actions of MACC employees, is attributable only to A.A. itself and to the "genuinely independent and private choice[]" of the MACC clients to attend the A.A. meetings. Witters, 474 U.S. at 487; cf. Zobrest, 509 U.S. at 10 (attributing the flow of aid to religious activities to the "private decision" of individual recipients).
 
 
 62
 Because any indoctrination conducted by A.A. rather than the MACC staff is not attributable to the State, and because the MACC's encouragement of client participation, although attributable to the State, is not indoctrination, the State's funding of such encouragement does not "result in governmental indoctrination." Agostini, 521 U.S. at 234. DeStefano has met none of the three Lemon-Agostini "effects" criteria, and we therefore hold that State financing of this activity by MACC employees does not have the primary effect of advancing religion.
 
 
 63
 3. Staff Participation in A.A. Activities.
 
 
 64
 Although the MACC's urging of client participation in A.A.'s program thus passes the constitutional test, we reach a different conclusion with respect to DeStefano's allegations that MACC staff members themselves supervise A.A. meetings and discuss A.A. literature and scripture at nightly meditation sessions and at regularly scheduled MACC events. Direct state funding of persons who actively inculcate religious beliefs crosses the vague but palpable line between permissible and impermissible government action under the First Amendment.
 
 
 65
 a. The Presence of Indoctrination
 
 
 66
 As the Supreme Court has repeatedly held, one of the few absolutes in Establishment Clause jurisprudence is the "prohibit[ion against] government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith." Bowen, 487 U.S. at 611 (quoting Grand Rapids Sch. Dist. v. Ball, 473 U.S. 373, 385 (1985)); see also Agostini, 521 U.S. at 223 ("[G]overnment inculcation of religious beliefs has the impermissible effect of advancing religion."); Levitt v. Committee for Pub. Educ. & Religious Liberty, 413 U.S. 472, 480, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973) ("[T]he State is constitutionally compelled to assure that the state supported activity is not being used for religious indoctrination."); Lemon, 403 U.S. at 619 ("The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion."); Zorach, 343 U.S. at 314 ("Government may not... undertake religious instruction.").
 
 
 67
 Although "it would be inappropriate to presume inculcation of religion," Mitchell, 120 S.Ct. at 2567 (O'Connor, J., concurring in the judgment), we indulge in no such presumption here. According to DeStefano, MACC staff members, whose salaries are paid largely by the State, read to their clients during the "Evening Meditation" sessions from the 12 Steps and 12 Principles, which states that those who "won't believe in God... [are] in a state of mind which can be described only as savage," and further that "[p]rayer and meditation are our principal means of conscious contact with God." And the A.A. sessions, the supervision of which the MACC manual lists as part of the staff's afternoon schedule, revolve almost entirely around the Twelve Steps, many of which mention "God" and the need to yield to "His will." That A.A. is not a traditional form of religious worship and seems to encompass a wide range of monotheistic beliefs does not affect the calculus. The First Amendment was intended to apply to "any religious activit[y] or institution[], whatever [it] may be called, or whatever form [it] may adopt to teach or practice religion." Everson, 330 U.S. at 16.
 
 
 68
 Because the readings at the "Evening Meditation" sessions and the content of the A.A. meetings are religious as a matter of law, the question is whether the MACC staff's alleged participation in those activities constitutes "indoctrination." Clearly so, we think. As we discussed in subpart III.A.2.d., above, to "indoctrinate" means to instruct in a body of doctrine or principles; to initiate by means of doctrinal instruction; to imbue with a partisan or ideological point of view; to inculcate. If the MACC staff members, instead of encouraging or urging MACC clients to attend A.A. sessions, actually read religious literature in order to "establish a positive and relaxed atmosphere" before clients go to sleep, as DeStefano alleges and as the organization's licensing documents promise, or supervise "intensely religious" meetings with the goal of helping clients to "turn [their] will and [their] lives over to the care of God," Warner, 115 F.3d 1070, they are giving instructions in and imbuing recipients with the tenets of A.A. and therefore engaging in indoctrination.
 
 
 69
 b. Attribution of the Indoctrination to the State
 
 
 70
 Our inquiry does not end there, however, because as we have discussed the Establishment Clause only targets indoctrination that "could reasonably be attributed to governmental action." Mitchell, 120 S.Ct. at 2541 (plurality opinion); see also Corporation of the Presiding Bishop of Church of the Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 337 (1987) ("For a law to have forbidden 'effects' under Lemon, it must be fair to say that the government itself has advanced religion through its own activities and influence.") (emphasis omitted). Having determined that the supervision of meetings and reading of religious literature by the staff of the MACC, a private organization, constitute indoctrination, we must now decide whether such activities are "governmental indoctrination" because they are supported directly and almost entirely by State funds. Agostini, 521 U.S. at 234 (emphasis added).
 
 
 71
 In Mitchell v. Helms, the Supreme Court discussed this issue in the course of deciding that the state may provide direct aid to religious schools in the form of secular educational materials and equipment. The Justices divided sharply over whether the neutral administration of a government aid program could immunize the state from a charge that disbursement of public funds to religious groups might result in governmental indoctrination. Justice Thomas, writing for the plurality, argued that
 
 
 72
 [i]n distinguishing indoctrination that is attributable to the State and indoctrination that is not, we have consistently turned to the principle of neutrality, upholding aid that is offered to a broad range of groups or persons without regard to their religion. If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government.... To put the point differently, if the government, seeking to further some secular purpose, offers aid on the same terms, without regard to religion, to all who adequately further that purpose, then it is fair to say that any aid going to a religious recipient only has the effect of furthering that secular purpose.
 
 
 73
 Mitchell, 120 S.Ct. at 2541 (plurality opinion) (citation omitted).
 
 
 74
 DeStefano has neither argued nor offered any evidence showing that the process by which the State of New York grants funds to alcohol treatment providers is anything but neutral with respect to the spiritual leanings of prospective recipients. Drawing on the Mitchell plurality's reasoning, then, it could be argued that so long as such funds are equally available to other religious, irreligious and areligious alcohol treatment programs, the State is free to fund the MACC staff's participation in the religious activities of A.A. without any danger that the resulting indoctrination could be attributed to the government.
 
 
 75
 But five Justices in Mitchell explicitly disagreed with Justice Thomas's discussion on this point. See id. at 2556-57 (O'Connor, J., concurring in the judgment); id. at 2581-82 (Souter, J., dissenting). His views in this regard therefore do not stand as binding precedent. See, e.g., Texas v. Brown, 460 U.S. 730, 737 (1983) (holding that the discussion of a contested issue in a plurality opinion is "not a binding precedent" if it "has never been expressly adopted by a majority of this Court"). The prevailing view of the Court on this matter appears to be that expressed by Justice O'Connor, who concurred in the Mitchell result but objected that although "neutrality is important," more central to the Court's jurisprudence is the principle that "actual diversion of government aid to religious indoctrination" is constitutionally suspect. Mitchell, 120 S.Ct. at 2556, 2557. Justice O'Connor's position on this issue garnered the support not only of Justice Breyer, who joined in her concurrence, but also of the three Justices in dissent, and is therefore the majority view of the Supreme Court. See Gentala v. City of Tuscon, 244 F.3d 1065, 1076(9th Cir.2001) (en banc) ("We are left... with a clear holding by a Supreme Court majority that when the government subsidizes religious activity, the fact that it is doing so pursuant to a program that treats religious speech or association coequally with other speech is not, standing alone, determinative in Establishment Clause analysis.").
 
 
 76
 We are instructed, moreover, that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193 (1977) (internal quotation marks omitted). Like the Sixth Circuit, we conclude that Justice O'Connor's opinion is narrower than the plurality's "as it utilizes the standard of Agostini... rather than creating a new standard centered on neutrality, thereby making its mandates controlling." Simmons-Harris, 234 F.3d at 957.
 
 
 77
 We thus follow Justice O'Connor's reasoning on this issue, recognizing that five Justices continue to adhere to the view that the Court's "decisions provide no precedent for the use of public funds to finance religious activities," at least where that use does not result solely from the private choice of individual aid recipients. Mitchell, 120 S.Ct. at 2558 (O'Connor, J., concurring in the judgment) (internal quotation marks omitted) (joined by Justice Breyer); see id. at 2572-73, 2582-89 (Souter, J., dissenting) (joined by Justices Stevens and Ginsburg); see also Everson, 330 U.S. at 15 16 ("[N]o tax in any amount, large or small, can be levied to support any religious activities.").
 
 
 78
 In accordance with this view, we conclude that the neutral administration of the state aid program at issue in this case is an insufficient constitutional counterweight to the direct public funding of religious activities alleged by DeStefano. If the MACC were performing those activities, the State would be directly financing the salaries of employees who daily preside over religious meetings and nightly expound upon religious texts -- all with the goal of convincing citizens to "turn [their] will and [their] lives over to the care of God." This, we conclude, would constitute the "use[] [of] government aid to support [A.A.'s] religious objectives," Mitchell, 120 S.Ct. at 2558 (O'Connor, J., concurring in the judgment), and would therefore result in impermissible governmental indoctrination of religion.
 
 
 79
 We also conclude that if, as alleged, the MACC staff members initiate screenings of A.A. videotapes for client audiences several times a week, that would similarly constitute governmental indoctrination when funded by the State. The record indicates that the content of the videotapes is similar to that of the A.A. literature discussed above. For example, in one such program entitled "The Twelve Steps of Alcoholics Anonymous," a priest named Father Martin stands before an assemblage of people and advises them that "[t]he prayer of the drunk is the prayer of a soul in pain, and those are the souls that God loves best." Another, "Moments... an Evening with Bill W.," explains how the speaker's path to sobriety was smoothed by his recognition of "the sure and certain evidence of God's grace." Thus, like reading aloud and discussing A.A. literature, playing these videotapes for an audience of clients not only constitutes the "use [by a state funded organization of] materials that have an explicitly religious content," Bowen, 487 U.S. at 621, but also directly expends State resources in the form of staff salaries on inculcating the religious content expressed through those tapes.[10]
 
 
 80
 c. Determination of the Facts of This Case
 
 
 81
 The record on appeal contains a great deal of conflicting testimony about the activities in which MACC staff members are in fact engaged. For example, it is unclear whether MACC staff "supervise" meetings as promised in the manual,[11] whether staff members show clients A.A. videotapes or merely permit such material to be left in common areas, and whether MACC meetings that are not associated with the A.A. program nevertheless involve staff-led discussions of A.A.'s religious tenets. Since the district court left off where we begin, at the concession that no coercion was involved, it never addressed the issues that we now conclude are central to this case. We therefore remand to the district court, directing it to resolve these factual disputes and to address, consistent with the principles articulated herein, any other ways in which the staff of the MACC expends State funds on the direct participation in the inculcation of religious beliefs, thus rendering the funding unconstitutional.
 
 
 82
 B. Use of Wallach Hall.
 
 
 83
 DeStefano next objects to two structural aspects of the relationship among the State, the MACC, and A.A.: the undisputed facts that A.A. holds its meetings in a State-owned building, Wallach Hall, and leaves its promotional materials in that facility's "day room."
 
 
 84
 The MACC, and through it A.A., enjoy access to State-owned Wallach Hall pursuant to a lease agreement between the MACC and the Dormitory Authority, a New York agency responsible for renting state properties to non-state tenants. Like the rest of the MACC's budget, most if not all of the rent paid to the State is in fact State money that has been granted to the MACC through the OASAS. According to undisputed deposition testimony, the amount of rent for Wallach Hall, which totaled $20,246.66 for the year 1996, is negotiated at arm's length by the parties to the lease and apparently reflects the fair market rental value of the property. Related fees for utilities are calculated at a "market square foot rate."
 
 
 85
 Because DeStefano's standing is based solely on his status as a taxpayer, we need not address the issues that might arise if this arrangement were challenged by an alternative alcohol treatment provider claiming that its exclusion from Wallach Hall in favor of A.A. pursuant to the MACC's occupancy of the building violated its First Amendment rights. We need only decide whether, in connection with the MACC's occupation of Wallach Hall, any tax dollars have been spent in a manner that violates the Establishment Clause.
 
 
 86
 Assuming for the moment that DeStefano's taxpayer standing extends far enough to allow him to contest the decisions of a state agency like the Dormitory Authority, cf. Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 479-82 (1982) (holding that an organization asserting the taxpayer standing of its members could not challenge the grant of federal property by an executive agency to a church-related college), we perceive nothing in the MACC's occupancy arrangement from which we could conclude that State tax funds are funneled to even arguably unconstitutional uses. To the extent DeStefano targets the payment of Wallach Hall's rent with money granted to the MACC by OASAS, that portion of taxpayer funds simply returns to the State pursuant to the MACC's lease -- a result that fails to implicate the Establishment Clause. And any contention that taxpayer dollars are impermissibly subsidizing religious activities at Wallach Hall, either by allowing the MACC to use the building at reduced rates or by including free access as part of the MACC's grant package, would fail because the rent for Wallach Hall is, according to the record evidence, determined by arm's length negotiations and based on the property's fair market value, while utility rates are set at market price. On this record, then, it appears that the State is enjoying the same return on Wallach Hall that it would were it to rent the building to a program without ties to a religious organization. The leasing operation does not constitute New York State assistance to the MACC or through it to A.A.
 
 
 87
 We therefore conclude that within the scope of this taxpayer suit, neither the MACC's occupation of Wallach Hall nor A.A.'s use of the building pursuant to that occupation raises a constitutional issue. We leave it to the district court on remand to determine in the first instance whether additional evidence, if any, affects our analysis or this conclusion.
 
 C. State Approval of Funding for the MACC
 
 88
 In addition to challenging actual State funding of the various and disputed activities that occur at the MACC, DeStefano contends that the State violates the Establishment Clause whenever it approves any program for public funding on the basis of licensing documents that are so religiously imbued as those presented to OASAS by the MACC. Specifically, DeStefano notes that the program's Policies and Procedures Manual, the "very documentation upon which MACC receives" approval for State funding, represents that the MACC, through its staff, encourages or participates in numerous A.A. activities as part of its alcohol treatment program. Even if no such activities actually take place at the MACC, DeStefano argues, the act of licensing any program for funding in reliance on these representations runs afoul of the Establishment Clause.
 
 
 89
 We need not reach the merits of this challenge, however, because it is clear to us that DeStefano does not have standing to raise it. Even in the context of an Establishment Clause taxpayer suit, a plaintiff must satisfy the "blend of constitutional requirements and prudential considerations" that define Article III standing. Valley Forge, 454 U.S. at 471. "[A] party who invokes the court's authority [must]'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,'" id. at 472 (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979)), and "that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" Id. (quoting Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38 (1976)).
 
 
 90
 DeStefano's challenge falters on the most basic of these "irreducible minimum" requirements. Id. at 472. No money is actually expended as a result of an organization receiving a State license; that step occurs at a later point, when the OASAS allocates and disburses the funds to counties and, in turn, to local programs like the MACC. In the absence of such State expenditures, we can conceive of only two "injuries" that DeStefano might allege as a result of the State's mere act of approving or licensing the MACC for funding. First, he might claim that he was harmed by the implicit message of religious "endorsement" conveyed by the OASAS' approval of the MACC's licensing documents -- a diffuse and "abstract injury in [the State's] nonobservance of the Constitution." Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 223 n.13 (1974). This claim "amount[s] to little more than [an] attempt[] to 'employ a federal court as a forum in which to air... generalized grievances about the conduct of the government,'" Valley Forge, 454 U.S. at 482 (quoting Flast, 392 U.S. at 106), and consequently does not constitute the "injury in fact" necessary to confer standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).
 
 
 91
 Second, DeStefano might assert a taxpayer injury arising from the State's act of licensing the MACC for funding by challenging the expenditure of funds on the salaries and administrative support of the OASAS employees who review and approve the MACC manual in this context. Although this argument does assert an "injury in fact," it fails to satisfy another equally fundamental prerequisite to the exercise of federal judicial power: redressability. The remedy that DeStefano seeks -- a prohibition against State funding approval predicated on the content of the manual submitted to the OASAS by the MACC -- would not prevent the expenditure of state funds in the manner alleged. State employees would continue to devote salaried time to reviewing incoming licensing applications; the fact that they would deny some of those applications as a result of a decision in DeStefano's favor in this case would not reduce the amount of taxpayer funds spent on such activities. DeStefano has therefore failed to demonstrate that his alleged injury "is likely to be redressed if the requested relief is granted." Gladstone, 441 U.S. at 100.
 
 
 92
 D. A.A. as "Religion" in The Context of This Case.
 
 
 93
 We have no reason whatever to doubt what we have been told: that A.A. is a vastly worthwhile endeavor; that it has saved the lives, health or well-being of untold thousands of Americans, at least in part because it requires participants "to turn [their] will and... lives over to the care of God as [they] underst[an]d him." See, e.g., David Cole, Faith Succeeds Where Prison Fails, N.Y. Times, Jan. 31, 2001, at A21; Paul J. Steinberg, Faith-Based Successes, Wash. Post, Jan 28, 2001, at B7. A.A. seems, moreover, to be different from traditional religious denominations with respect to certain aspects of Establishment Clause inquiry. It would appear, for example, that at least absent coercion, the threat to First Amendment values in cloaking New York State government with A.A.'s Truths, or arming A.A. with governmental power (including the power to tax), is relatively modest. There is little danger that links between New York State and A.A. will plant the seeds of an A.A. theocracy. It is difficult to imagine A.A. as the official or unofficial state religion of New York.
 
 
 94
 In his recent dissent in Mitchell, Justice Souter observed:
 
 
 95
 The establishment prohibition of government religious funding serves more than one end. It is meant to guarantee the right of individual conscience against compulsion, to protect the integrity of religion against the corrosion of secular support, and to preserve the unity of political society against the implied exclusion of the less favored and the antagonism of controversy over public support for religious causes.
 
 
 96
 Mitchell, 120 S. Ct. at 2572 (Souter, J., dissenting). Some concerns of the Establishment Clause that Justice Souter recites seem rather muted in the context of the case before us. Because A.A.'s potential members are not humankind in general, but a particular group of afflicted persons who are dispersed, both geographically and socially, A.A. seems unlikely to be corroded by secular support in the form alleged here.
 
 
 97
 This is not to say, though, that all Establishment Clause implications are absent. There is, for example, a possibility that state funding of A.A. will endanger less favored or disfavored religions. A state might very well prefer to support A.A.'s nondenominational monotheism but not more sharply sectarian addiction treatment programs, with adverse consequences for the latter and their religious messages. And there is a danger that the power of the state or state funding will be used to coerce worship or prayer, as was the case in Warner and may indeed have been the case here.
 
 
 98
 At the end of the day, however, this is not the sort of balancing inquiry upon which we may embark. We must decline to distinguish A.A. from other religions for Establishment Clause purposes because, were we to make distinctions based on this sort of analysis, we would be obliged to ask similar questions in all Establishment Clause cases: Is this the sort of religion that raises Establishment Clause concerns? Do we consider the mission of the religion at issue to be particularly beneficial or "vastly worthwhile"? To do so, we would be required to investigate and evaluate the tenets of each, and then to make just the sort of judgment among and about religions that we, as an arm of the federal government, cannot be entrusted to make.
 
 
 99
 So we must be content to observe the rough boundary that the cases have established between that which is and that which is not "religion" for these purposes. A.A., our cases teach, is on the religion side of the line. That must, for us, be the end of the matter.
 
 CONCLUSION
 
 100
 For the foregoing reasons, the judgment of the district court is vacated and the case remanded for further proceedings consistent with this opinion.
 
 
 
 NOTES:
 
 
 [1]
 In an order addressing an earlier motion, the district court dismissed DeStefano's claims against defendants Emergency Housing Group, Inc., Orange County, and Glenn S. Goord, leaving only the claims against the State defendants. Although all of the defendants were named by DeStefano as parties to this appeal, we do not read his brief on appeal to challenge the district court's dismissal of his claims against Emergency Housing Group, Inc., Orange County, or Goord.
 
 
 [2]
 Emergency Housing Group is referred to by the district court as an independent contractor, see DeStefano v. Miller, 67 F. Supp. 2d 274, 277 (S.D.N.Y. 1999), a characterization that neither party disputes.
 
 
 [3]
 The Twelve Steps of A.A. are:
 1. We admitted we were powerless over alcohol that our lives had become unmanageable.
 2. Came to believe that a power greater than ourselves could restore us to sanity.
 3. Made a decision to turn our will and our lives over to the care of God as we understood him.
 4. Made a searching and fearless moral inventory of ourselves.
 5. Admitted to God, to ourselves and to another human being the exact nature of our wrongs.
 6. Were entirely ready to have God remove all these defects of character.
 7. Humbly asked Him to remove all of our shortcomings.
 8. Made a list of all persons we had harmed, and became willing to make amends to them all.
 9. Made direct amends to such people wherever possible, except when to do so would injure them or others.
 10. Continued to take personal inventory and when we were wrong promptly admitted it.
 11. Sought through prayer and meditation to improve our conscious contact with God, as we understood Him, praying only for knowledge of His will for us and the power to carry that out.
 12. Having had a spiritual awakening as a result of these steps, we tried to carry this message to alcoholics, and to practice these principles in all our affairs.
 
 
 [4]
 The remaining five percent of the MACC's budget comes from the Orange County Department of Social Services, the United Way, and private donations.
 
 
 [5]
 "NA" is Narcotics Anonymous, a program for narcotics addicts similar to A.A. See Kerr v. Farrey, 95 F.3d 472, 474 (7th Cir. 1996).
 
 
 [6]
 The complaint included various state-law claims, over which the district court declined to exercise supplemental jurisdiction in an order dated July 30, 1997. The disposition of those claims is not relevant to this appeal.
 
 
 [7]
 As noted in subpart III.A.2.d, below, coercion may be relevant not only to whether MACC clients were coerced to worship or pray contrary to Lee and its progeny, which we discuss here, but also whether their indoctrination by A.A. is attributable to the State under Lemon-Agostini.
 
 
 [8]
 "Worship" has been defined as "[t]he reverent love and devotion accorded a deity, an idol, or a sacred object [and] [t]he ceremonies, prayers, or other religious forms by which this love is expressed." The American Heritage Dictionary of the English Language 1984 (4th ed. 2000). "Prayer," in turn, has been defined as "[a] reverent petition made to God, a god, or another object of worship." Id. at 1379.
 
 
 [9]
 Judge Katzmann does not join the balance of the discussion in this subpart III.A.2.d, although he concurs in the result. He believes it is sufficient to support the result to determine that, based on the lack of evidence, we cannot find that the MACC employees' encouragement "resulted in" indoctrination. See Agostini, 521 U.S. at 223.
 
 
 [10]
 Bowen supports this conclusion. In addressing the "as applied" portion of the plaintiff's challenge in that case, the Court remanded in order for the district court to determine, inter alia, whether government aid had in fact been used to fund "'specifically religious activit[ies] in an otherwise substantially secular setting.'" Bowen, 487 U.S. at 621 (quoting Hunt v. McNair, 413 U.S. 734, 743 (1973)) (alteration in original). Relevant to this determination, the Court held, would be a finding that "AFLA grantees [have] use[d] materials that have an explicitly religious content or are designed to inculcate the views of a particular religious faith." Id. These statements aptly describe what would occur at the MACC if staff members were to read from A.A. literature, initiate screenings of A.A. videotapes, and supervise A.A. meetings.
 
 
 [11]
 The district court apparently thought that MACC staff members do not supervise such meetings. See DeStefano, 67 F. Supp. 2d at 278. In light of the crucial significance imparted to this dispute under the principles we discuss, however, the court may wish to revisit this finding.